The BANK OF NEW YORK,
Plaintiff–Appellee,

v.

AMOCO OIL COMPANY,
Defendant–Appellant.

AMOCO OIL COMPANY,
Counter–Claimant,

v.

The BANK OF NEW YORK,
Counter–Defendant.

AMOCO OIL COMPANY,
Third–Party Plaintiff,

v.

DREXEL BURNHAM LAMBERT
TRADING CORPORATION,
Third–Party Defendant.

No. 1620, Docket 93–9031.

United States Court of Appeals,
Second Circuit.

Argued April 21, 1994.
Decided Aug. 8, 1994.

Melvin Goldstein, Washington, DC (Charles R. Claxton, Goldstein & Claxton, Washington, DC, of counsel), for defendant-appellant.

James H. Forte, Newark, NJ (Michael J. Geraghty, William F. Maderer, Saiber, Schlesinger, Satz & Goldstein, of counsel), for plaintiff-appellee.

Before: OAKES, KEARSE and MAHONEY, Circuit Judges.

OAKES, Senior Circuit Judge:

Amoco Oil Company appeals from a judgment of the Southern District of New York, Charles H. Tenney, *Judge,* (1) finding that (a) "holding certificates" issued by Amoco, as lessee, evidencing the lessor's ownership of and right to a quantity of leased platinum constituted negotiable "documents of title" under Article 7 of the Uniform Commercial Code and (b) the "holding certificates" were duly negotiated to the Bank of New York; and (2) awarding the Bank of New York $550,000 plus prejudgment interest for damages caused when Amoco failed promptly to deliver the platinum. We affirm.

## I. Background

The Amoco Oil Company ("Amoco") operates six oil refineries in the United States which use platinum as a catalyst to speed the

process of refining gasoline. To prepare the platinum to serve as a catalyst in these refineries, Amoco first binds the platinum to aluminum pellets and then introduces the pellets into the refining process. During the refining process, other elements bind with the platinum, gradually decreasing its catalytic effectiveness. After about six months, the catalyst is "spent" and the pellets sent to a metal reclaimer where the platinum is recovered from the pellets. The recovered platinum is then used again as a catalyst.

To meet its needs of catalytic grade platinum, Amoco owned approximately 280,000 troy ounces of platinum. Amoco occasionally needed additional platinum, however, because of the length of time it took to recover the platinum from the spent catalytic pellets. Amoco also occasionally needed additional platinum because some platinum—between 2,000 and 4,000 ounces a year—was lost in the process of loading and unloading the platinum from the refinery and in the process of reclaiming the platinum from the spent catalytic pellets. To meet these occasional needs, Amoco leased additional platinum, commingling the leased platinum with the platinum it owned outright.

Prior to the bankruptcy of the Drexel Burnham Lambert Group, a subsidiary of that group, Drexel Burnham Lambert Trading ("DBL Trading"), speculated in metals, including platinum. Rather than simply warehouse the platinum it purchased, DBL Trading leased the platinum to industrial users. In this way, DBL Trading stood to benefit from rental income generated by the leased platinum as well as from any increase in the value of the platinum on the spot market. DBL Trading's drive to maximize profits did not end there, however. Rather, having leased the platinum, DBL Trading would use its ownership of the platinum as collateral to secure financing, essentially using the platinum to leverage its trading accounts.

DBL Trading leased 22,230 troy ounces of platinum to Amoco. As a condition of these leases, Amoco issued "holding certificates" to DBL Trading. These documents certified that Amoco was "holding" a specified quantity of platinum of a catalytic grade "for the account or order of" DBL Trading and stated that the "[m]aterial is to be released on surrender of this Certificate properly endorsed." On December 6, 1989, DBL Trading endorsed certain of these certificates over to the Bank of New York ("BNY") as collateral to secure loans.

On February 13, 1990, the Drexel Burnham Lambert Group declared bankruptcy. Upon learning of this, BNY decided not to renew its loans to DBL Trading. Shortly thereafter, BNY declared DBL Trading in default of its obligations. BNY then demanded that Amoco deliver the platinum to BNY's account. Amoco refused. On March 12, 1990, BNY brought suit against Amoco under the diversity jurisdiction of the Southern District of New York.

On April 4, 1990, Amoco and BNY entered into a partial settlement. Under that partial settlement, Amoco agreed to deliver the platinum to BNY. Because the value of platinum had fallen since February 15, 1990, however, BNY reserved the right to continue its suit against Amoco. BNY did agree, though, that any damages recovered in that action were not to exceed $550,000. This agreement was filed with the district court on April 6, 1990.[1] Agreement, *Bank of New York v. Amoco Oil Co.*, No. 90–1617 (S.D.N.Y. Apr. 6, 1990) ("Agreement").

In an order dated November 5, 1991, Judge Tenney denied cross motions for summary judgment. The case was tried to the court without a jury on June 14, 15, and 16, 1993. In an order entered on August 26, 1993, Judge Tenney found for BNY, awarding BNY $550,000 in damages plus prejudgment interest from April 4, 1990. Final judgment was entered on September 7, 1993.

## II. Jurisdiction

The district court had jurisdiction pursuant to 28 U.S.C. § 1332 (1988), because BNY is a New York corporation whose principal place of business is the state of New York, Amoco is a Maryland corporation headquartered in Illinois, and the amount in controversy ex-

---

1. Amoco's counterclaims against BNY were dismissed by stipulation on October 30, 1990.

ceeded $50,000. Final judgment was entered on September 7, 1993. Amoco filed a timely notice of appeal on October 4, 1993. This court has jurisdiction pursuant to 28 U.S.C. § 1291 (1988).

## III. Discussion

### A. Applicable Law and the Standard of Review

■■■ A federal court sitting in diversity jurisdiction will, of course, apply the law of the forum state on outcome determinative issues. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652 (1988). This includes the forum state's rules governing choice of law. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Under the law of New York, the parties may stipulate that the law of a state bearing a reasonable relation to the transaction governs their rights and duties under the transaction. N.Y.U.C.C. § 1–105(1).[2] In this dispute, the parties have stipulated that the law of New York governs. Agreement at 6.

■■■ Before we can apply the law of New York, however, we must determine what that law is. Although the district court made this determination below, we must make this determination *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). In making this determination, we will consider not only state statutes but also state decisional law. *Erie*, 304 U.S. at 78, 58 S.Ct. at 822. We of course will afford the greatest weight to the decisions of the New York Court of Appeals. However, "where there is 'no decision by th[e New York Court of Appeals] then [we] must apply what [we] find to

be the state law after giving "proper regard" to relevant rulings of other courts of the State.'" *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967)). Where the law of the state is uncertain or ambiguous, we will carefully predict how the highest court of the state would resolve the uncertainty or ambiguity. *See Travelers*, 14 F.3d at 119. In making this prediction, we may "consider relevant cases from jurisdictions other than New York in an effort to predict '[w]hat would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New York "jurisprudence." '" *Id.* (quoting *Cooper v. American Airlines*, 149 F.2d 355, 359 (2d Cir.1945)); *see also Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir.1993) (federal court may consider all sources used by the highest court of the state, including decisions of other jurisdictions).

■■■ The central question in this appeal is whether "holding certificates" for platinum constitute negotiable "documents of title" under Article 7 of the Uniform Commercial Code ("U.C.C.").[3] Many of the issues in this case, therefore, are governed by New York's version of the U.C.C.—particularly Article 7. This case, however, does not involve the types of transactions—warehousing and shipping—with which the drafters of Article 7 were primarily concerned. Rather, this case involves two types of transactions: (1) the lease of platinum and (2) a loan secured, in part, by the lessor's interest in the platinum. The terms of Article 7, however, like the terms of other Articles, are to "be liberally construed and applied to promote [the U.C.C.'s] underlying purposes and policies."

---

2. Unless otherwise noted, citations to N.Y.U.C.C. Articles 1 and 2 are to McKinney 1993 and citations to N.Y.U.C.C. Article 7 are to McKinney 1990.

3. The holding certificates provided:
 This is to certify that as of [date], we are holding for the account or order of:
 Drexel Burnham Lambert Trading Corporation
 60 Broad Street
 New York, New York 10004
 The following material:

[number of] troy ounces of platinum sponge metal 99.95% catalytic grade
This material is free of all liens and encumbrances.
Material is to be released on surrender of this Certificate properly endorsed.

Company Name: <u>Amoco Oil Company</u>
By: <u>[Signature]</u>
 E.A. Sloss
Date: <u>[Date]</u>

N.Y.U.C.C. § 1–102(1). This rule of construction is especially important in this case because it involves the lease of goods—a commercial practice that was relatively uncommon when the U.C.C. was first adopted.[4]

B. Documents of Title under U.C.C. § 1–201(15)

■ BNY claims that the holding certificates issued by Amoco fall within the U.C.C.'s definition of "documents of title." As such, BNY argues, Amoco is subject to the obligations imposed by the U.C.C. upon issuers of documents of title including the duty to deliver the goods upon demand accompanied by production of the document. *See* N.Y.U.C.C. § 7–403.

The U.C.C. defines "document of title" as follows:

"Document of title" includes bill of lading [sic], dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

N.Y.U.C.C. § 1–201(15). The question whether a particular document qualifies as a "document of title," therefore, presents issues of both fact and law. The requirement that the document be "treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers" raises factual questions regarding "the regular course of business or financing." By contrast, the second requirement that the "document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass" raises legal questions such as the scope of the term "bailee" and the adequacy of identification.

1. Evidencing an Entitlement to Receive, Hold and Dispose

■ With respect to the first, fact-dependent inquiry, the district court found that, "in the regular course of business or financing," commodities trading firms and banks accept holding certificates as collateral for loans and, consequently, treat them as evidence that a person in possession of such a holding certificate is entitled to receive the commodities referred to in that certificate. *Bank of New York v. Amoco Oil Co.,* 831 F.Supp. 254, 260 (S.D.N.Y.1993). As a factual finding, this aspect of the district court's decision is subject to review under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also Salve Regina,* 499 U.S. at 233, 111 S.Ct. at 1222 (confirming that appellate courts should continue to defer to district court findings of fact); *Alentino, Ltd. v. Chenson Enters., Inc.,* 938 F.2d 26, 28 (2d Cir.1991).

■ There was ample evidence to support the district court's finding. The district court heard testimony that metals trading firms in the regular course of business pledged holding certificates to banks as collateral for loans. The district court also heard testimony that banks, including the Bank of New York, retained holding certificates as collateral for loans. Further, the district court heard testimony that the Bank of New York listed the platinum described in the holding certificates as collateral on its collateral reports.

■ Amoco contends that because there was no evidence that a holding certificate had actually been sold, the district court's finding was clearly erroneous. We reject this argu-

---

4. While New York has recently adopted a new Article 2–A governing the lease of goods, the effective date of the Article has not yet passed. Even if the effective date had passed, there would remain the question whether the new Article 2–A would apply retroactively to contracts made be-

fore its effective date. Thus, the new Article does not govern this dispute. Article 2–A is still relevant, however, in so far as it may provide insight into the purposes or policies of other Articles of the U.C.C.

ment. There is no requirement that a document be "sold" to constitute a document of title. It is enough that the document be treated, "in the regular course of business or financing ... as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers."

Because there is no requirement, as a matter of law, that a document be "sold" to constitute a document of title and because, in reviewing the district court's finding in light of all the evidence, we cannot state that we are "left with the definite and firm conviction that a mistake as been committed." *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We therefore affirm the district court's finding that holding certificates for precious metals were, "in the regular course of business or financing ... treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers."

### 2. Addressed to Bailee and Identifying Goods

We next determine whether, as a matter of law, the language of the holding certificates "purport[s] to be issued by ... a bailee and purport[s] to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass." This involves two subsidiary questions: (1) whether the holding certificates were addressed to a "bailee" and (2) whether the holding certificates covered goods that were either "identified or ... fungible portions of an identified mass."

### a. Definition of Bailee

Amoco argues that the district court erred in concluding that the holding certificates were documents of title under U.C.C. § 1–201(15) because Amoco does not meet Article 7's definition of bailee and, therefore, the holding certificates cannot "purport to be issued by or addressed to a bailee." To make this argument, Amoco observes that Article 7 defines "bailee" as "the person who

by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them." N.Y.U.C.C. § 7–102(1)(a). Amoco then argues that "[b]ecause 'bailee' is defined with reference to 'goods,' Amoco could not purport to be a bailee unless the platinum referenced in the certificate was 'goods.'" Amoco's Brief at 18.

Amoco argues that the definition of "goods" provided by Article 7 cannot encompass the platinum at issue in this litigation. The U.C.C. provides that "'Goods' means all things which are treated as movable for the purposes of a contract of storage or transportation." N.Y.U.C.C. § 7–102(1)(f). Amoco argues that because "there is nothing in the certificates to indicate that Amoco had possession of the platinum for 'the purposes of a *contract of storage or transportation,*'" the holding certificates do not purport to cover "goods" and, hence, cannot be "documents of title." Amoco's Brief at 18 (Amoco's emphasis).

Amoco concedes that there are "parallels between the issuance of the holding certificates in connection with the leases and the issuance of documents of title in connection [with] contracts of storage or transportation." Amoco's Brief at 20. But Amoco maintains that "[p]arallels and similarities ... do not satisfy ... U.C.C. requirements." Essentially, Amoco argues that Article 7 of the U.C.C. does not apply to certificates issued by a lessee to a lessor that certify the lessor's ownership of the leased goods and promise to deliver the leased goods to the lessor/owner upon demand.

When Article 7 was drafted, its authors were concerned primarily with legal problems encountered in warehousing and shipping. This is evident from the very structure of Article 7. Article 7 devotes two parts to "special provisions" governing "warehouse receipts" and "bills of lading." *See* N.Y.U.C.C. §§ 7–201 to –211 and 7–301 to –309. It is also evident from the frequent references throughout the article to warehousemen and carriers or shippers. *See, e.g.,* N.Y.U.C.C. § 7–403. This primary concern perhaps explains the choice of words "stor-

age or transportation" used in Article 7's definition of goods. N.Y.U.C.C. § 7–102(1)(f).

■ At the same time, however, it is clear that the authors of the U.C.C. did not intend to limit its applicability solely to warehouse receipts and bills of lading. This is indicated by the very title of Article 7— "Warehouse Receipts, Bills of Lading, and *Other Documents of Title.*" (Emphasis added.) Further, the definition of "document of title," clearly contemplates documents other than warehouse receipts and bills of lading. In addition to others, "document of title" includes "any ... document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers." N.Y.U.C.C. § 1–201(15).

Further, the drafters of the U.C.C. expressly stated that they could not anticipate fully the development of commercial practices. Nevertheless, they hoped that the U.C.C. would serve as a "semi-permanent piece of legislation" that "will provide its own machinery for expansion of commercial practices." N.Y.U.C.C. § 1–102, Official Comment 1. Accordingly, the U.C.C. provides that it "shall be liberally construed and applied to promote its underlying purposes and policies." N.Y.U.C.C. § 1–102.

In light of express indications that Article 7 is not limited only to warehouse receipts and bills of lading, Amoco's strict interpretation of Article 7's definition of goods is ill-founded. This strict interpretation seems especially ill-founded in light of the canon that the Code is to be construed liberally, "to[, *inter alia,*] permit the continued expansion of commercial practices through custom, usage and agreement of the parties." N.Y.U.C.C. § 1–102(2)(b). Further, the U.C.C. was originally promulgated at a time when the lease of commercial goods was relatively rare:

> In part because commercial leasing of goods was not widespread, it was given only nominal coverage under Articles 2 and 9. Accordingly, the courts applied the Code to leases mainly by analogy.

1A James J. White & Robert S. Summers, *Uniform Commercial Code* at 2 (1991) (footnotes omitted). Thus, contrary to Amoco's argument, it is precisely by "parallels and similarities" that questions concerning the applicability of the U.C.C. to leases of commercial goods are to be resolved.

■ We find that a certificate issued by a lessee to a lessor evidencing the lessor's interest in the leased goods and promising to deliver the leased goods to the lessor upon demand accompanied by production of the certificate to be analogous to a document of title issued by a warehouseman to the owner of goods that have been entrusted to the warehouseman's care for storage. The only relevant difference between the two situations is that the warehouseman is paid for storing the goods for a time, while the lessee pays for the use of the goods for a time. This difference, however, should not exclude the certificate from coverage under Article 7.

For example, the owner of an old grey mare may well pay someone to stable the horse. The owner of a thorough-bred stallion, however, may well demand payment from a horsebreeder who stables the horse but uses the horse for stud. In both cases, the horse may be stabled for the same period of time and returned to the owner in much the same condition as when it entered the stables. Also, in both cases, the owner may demand a receipt from the "warehouseman" that certifies the owner's interest and in which the "warehouseman" promises to deliver the horse upon demand. The fact that the owner pays the stable-hand in the first instance but is paid by the horse-breeder in the second should not itself determine whether the certificate falls within the purview of Article 7.

In a less pastoral example, the owner of a fleet of airplanes may find that temporarily decreased travel demand in areas serviced by the fleet renders some planes temporarily superfluous. The owner of the planes could store the planes in hangars, renting storage space from the owner of the hangars. Alternatively, the owner of the planes could lease the planes to an operator of routes that are experiencing increased demand, demanding

payment from the operator for the use of the planes. In both cases, the planes are entrusted to the care of another for a period of time. Also in both cases, the owner may demand from the hangar operator or the lessee a certificate evidencing the owner's interest in the planes and promising to return the planes on demand. The fact that the owner pays the hangar operator but demands payment from the lessee should not remove the lessee's certificate from the purview of Article 7.

If a document could be removed from the purview of Article 7 merely because the subject goods are rented rather than stored, owners of goods who wish to lease the goods rather than store them would have to discount the rents they expect to receive by the possibility that, in the absence of law recognizing the validity of a document of title in leased goods, they may not be able to recover their goods when they need them. At the margins, this uncertainty might force the owners of potentially productive assets to leave those assets idle in warehouses when they could be serving productive purposes to the benefit of both the owner/lessor and the lessee.[5]

The U.C.C. should be construed "to simplify, clarify and modernize the law governing commercial transactions" and "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." N.Y.U.C.C. § 1–102(1)(a) and (b). The definition of "goods,"

therefore, should not be interpreted to remove a document from the purview of Article 7 simply because the owner is able to command payment for lending the goods rather than required to make payment for storing the goods. On the contrary, Article 7 should afford parties a documentary device to facilitate the productive lease, rather than the idle storage, of goods too useful to be left idle but whose value is too volatile to commit the asset irretrievably for the term of the lease. We therefore find that the courts of New York would reject Amoco's arguments that the platinum was not "goods" under Article 7 and that Amoco was not a "bailee" for the purposes of Article 7 of the U.C.C.[6]

#### b. Identification of Goods

For the holding certificates to qualify as documents of title under the U.C.C., the goods to which the certificates refer must be properly identified. Under the U.C.C., the quantities of platinum referred to in the various holding certificates must be "either identified *or ... fungible portions of an identified mass.*" N.Y.U.C.C. § 1–201(15) (emphasis added). Amoco argues that the holding certificates are not documents of title because they did not identify the platinum by "pool" or "lot number" or "bar number." Amoco concedes, however, that identification of the platinum by pool or lot number or bar number would have been impossible. Under Amoco's analysis, therefore, it would have been impossible for Amo-

5. It is true that a lessee who issues a document of title for leased goods incurs some risk that the goods will be demanded before the term of the lease expires. Presumably, however, the lessee is compensated for bearing this risk through a lower rental. Further, if the goods are demanded before the term of the lease expires, the lessee may have a cause of action against the lessor for breach of the lease. Thus, the issuance of a document of title does not convert a fixed-term lease into a lease that is terminable at will. Rather, it is a documentary device that enables the lessor to breach, compensate the lessee for the breach, and dedicate the goods to a higher-valued use.

6. Amoco argues that *Michigan Nat'l Bank v. Michigan Livestock Exch.*, 432 Mich. 277, 439 N.W.2d 884 (Mich.1989) supports its position that it was not a bailee under Article 7. There, an auctioneer, only incidentally storing livestock

pursuant to contracts for commission sales, was held not a "bailee" within U.C.C. §§ 7–101, –102(1)(a) and (f), and –404 and a trucker's receipt which did not state who was to receive the livestock was held not to be a "document of title" within U.C.C. §§ 1–201(15) and 7–202. *Michigan Nat'l Bank* is, however, distinguishable from this case. Unlike the "trucker's receipts" in *Michigan Nat'l Bank,* the holding certificates both acknowledged possession and promised to "release" the platinum "for the account or order" of the bailor. This promise of release for the account or order satisfies the U.C.C.'s requirement that the bailee contract to deliver the goods. *Michigan Nat'l Bank* offers no basis to exclude from the definition of bailee bailees in possession pursuant to a lease or a bailment for mutual benefit—in which benefits from the use of the property flow both to the bailor and the bailee.

co to create documents of title in the platinum. Amoco also argues that the district court incorrectly relied upon *Public Serv. Comm'n v. R.F. Gunkelman & Sons, Inc.,* 219 N.W.2d 853, 857 (N.D.1974) (holding that a document identifying sunflower seeds by quantity and grade was sufficient to constitute a document of title), for the proposition that a document of title need only identify goods by quantity and grade. Amoco attempts to distinguish this case by arguing that under the facts of *Gunkelman* the goods were identified not only by quantity and grade but by location. Amoco's Brief at 24. The identification of the goods in *Gunkelman,* however, was simply an incident of the fact that the issuer of the document had only one elevator. *Gunkelman,* therefore, did not expressly hold that a document of title *must* identify the goods by their location. If the U.C.C. is to be interpreted to allow the creation of documents of title for platinum used as catalyst by oil refineries, then identification by reference to the grade and quantity of the platinum must suffice. *See Bank of New York,* 831 F.Supp. at 263 (citing N.Y.U.C.C. § 1–201(15), Official Code Comment ("It is unforeseeable what documents may one day serve the essential purpose now filled by warehouse receipts and bills of lading.... The definition is stated in terms of the function of the documents with the intention that any document which gains commercial recognition as accomplishing the desired result shall be included within its scope")). Furthermore, Article 7 adopts a flexible approach to problems engendered by the commingling of fungible goods. N.Y.U.C.C. § 7–207 provides, first, that "different lots of fungible goods may be commingled" and, second, that "fungible goods so commingled are owned in common by the persons entitled thereto and the warehouseman is severally liable to each owner for that owner's share." In sum, under the U.C.C., a warehouseman may commingle different lots of fungible goods. We will not so interpret the identification requirement of N.Y.U.C.C. § 1–201(15) as to preclude a bailee from exercising its right to commingle different lots of fungible goods. Conversely stated, we will not allow the fact that Amoco chose to exercise its right to commingle the platinum to permit Amoco to escape its obligation to deliver the platinum pursuant to the holding certificates. Accordingly, we find that Amoco's identification of the platinum by quantity and by grade met the identification requirement of N.Y.U.C.C. § 1–201(15).

## C. Negotiability

 The U.C.C. provides:

A warehouse receipt, bill of lading or other document of title is negotiable ... if by its terms the goods are to be delivered to bearer or to the order of a named person....

N.Y.U.C.C. § 7–104(1)(a). The holding certificates at issue in this case stated "This is to certify that as of [date], we are holding for the account or order of...." Amoco argues that this language did not render the holding certificates negotiable. Specifically, Amoco argues that under N.Y.U.C.C. § 7–104(1)(a), a "document of title is negotiable 'if by its terms the goods are *to be delivered* to bearer or to the order of a named person.'" Amoco's Brief at 25 (Amoco's emphasis). Amoco's placement of the emphasis is illustrative. If the emphasis is well-placed, if the drafters of the U.C.C. intended to emphasize a requirement that negotiable documents of title carry language emphasizing their *deliverability,* then Amoco's argument might be correct. However, Amoco's emphasis is ill-placed. Rather than emphasizing a requirement that documents of title carry the words "to be delivered" the provision seems primarily to require that negotiable documents of title indicate that the goods are to be surrendered *"to bearer or to the order of a named person."* This reading is supported by the Official Comment to this provision. That comment indicates that the language " 'Deliverable on proper indorsement and surrender of this receipt' will not render a document negotiable." That is, a document of title may carry a cognate of "deliver" without satisfying the requirements for negotiability. By negative implication, Section 7–104(1)(a) requires that negotiable documents of title carry language bearing, not on their deliverability, but on their negotiability—*viz,* that the goods are "to be delivered *to bearer or to the order of a named person."* Whether the

goods are to be "delivered" or "surrendered" or "transported" or, (as in this case) "held and released" makes little difference in determining whether the parties intended a document of title to be negotiable. Therefore, without relaxing the requirement that documents carry the prepositional phrase "to bearer or to the order of a named person," we find that a document that promises to hold and release goods satisfies the U.C.C.'s requirement that a negotiable document of title indicate that the goods are "to be delivered." We conclude, therefore, that the courts of New York would find that the fact that the holding certificates stated "we are holding for the account or order of . . ." and promised to release the platinum upon surrender of the certificates renders them negotiable under the U.C.C.

### D. Due Negotiation

▮ The U.C.C. provides:

A negotiable document of title running to the order of a named person is negotiated by his indorsement and delivery.

N.Y.U.C.C. § 7–501(1). Thus, with DBL Trading's indorsement and delivery to BNY, the certificates were negotiated to BNY. The U.C.C. also provides, however, as follows:

A negotiable document of title is "duly negotiated" when it is negotiated in the manner stated in this section to a holder who purchases it in good faith without notice of any defense against or claim to it on the part of any person and for value. . . .

N.Y.U.C.C. § 7–501(4). There remains, therefore, the question whether BNY took the certificates with notice of Amoco's lease and, if so, whether notice of Amoco's lease deprives BNY of holder in due course status.

The definition of notice is set forth in Article 1 of the U.C.C.:

A person has "notice" of a fact when

 (a) he has actual knowledge of it; or

 (b) he has received a notice or notification of it; or

 (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this Act.

N.Y.U.C.C. § 1–201(25). The district court found that BNY did not have notice of a defense against the holding certificates. In so finding, however, the district court appeared to focus on the fact that the BNY official who accepted the holding certificates as collateral, Mr. Van Den Hogen, "testified that he was never told that Amoco's leases overrode the bank's right to the platinum." *Bank of New York,* 831 F.Supp. at 265. That is the district court found that although BNY knew of the leases, it did not have notice of a defense against the holding certificates.

As White & Summers have observed, "Article Seven is analogous in several basic respects to Article Three of the Code on commercial paper." 2 White & Summers, *Uniform Commercial Code* § 21–1, at 133 (1988). Because Article 7 is analogous to Article 3 in basic respects, and because the requirement that a holder in due course take without notice serves the same purpose in Article 7 as it does in Article 3, we will determine whether knowledge that the holding certificates arose out of a lease agreement constitutes notice of a defense against the lease by considering the analogous situation under Article 3.

▮ Under Article 3, notice that a negotiable instrument arose from an underlying contract will not in itself disqualify a holder as a holder in due course. N.Y.U.C.C. § 3–304(4)(b) (McKinney 1991) ("Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim . . . (b) that it was issued or negotiated in return for an executory promise or accompanied by a separate agreement, unless the purchaser has notice that a defense or claim has arisen from the terms thereof"). Absent knowledge of a breach in the underlying agreement, the holder of a negotiable instrument qualifies as a holder in due course even if the holder took with

knowledge of the underlying agreement. There was absolutely no evidence of a breach in the lease agreement at the time BNY took the holding certificates, let alone evidence that BNY was aware of such a breach. Absent evidence that BNY was aware of a breach in the underlying agreement, the fact that BNY may have been aware that the holding certificates arose out of lease agreements between DBL Trading and Amoco will not deprive BNY of the status of holder in due course.

We note that this approach is consistent with the approach adopted by proposed Article 2–A of the U.C.C., governing the lease of goods. New York recently adopted this new article. Although proposed Article 2–A does not govern this dispute, *see* note 4, *supra,* the fact that the approach commended by an application of the principles of Article 3 is consistent with the approach of proposed Article 2–A is significant. The proposed article codifies the general proposition that the creditor of a lessor takes subject to the lease. The article sets forth, however, exceptions to this general proposition. Most notably, a secured creditor who has perfected his interest before the lease becomes effective does not take subject to the lease. In this case, there was ample evidence that BNY had perfected its security interest in any documents within the possession of DBL Trading and that the leases did not become effective until Amoco, as a condition of its lease, delivered the holding certificates to DBL Trading. Furthermore, this approach is consistent with the policy and purposes of the U.C.C. as expressed in other provisions of Article 7. Specifically, the U.C.C. provides:

> The obligations imposed by this Article on an issuer apply to a document of title regardless of the fact that ...
>
> (c) the goods covered by the document were owned by the bailee at the time the document was issued....

N.Y.U.C.C. § 7–401. It would appear from this provision that even if Amoco owned the platinum outright, it could not, as the issuer of the holding certificates, avoid its obligations to surrender them. *A fortiori,* a lesser claim than ownership should not allow Amoco to escape its obligations. Thus, although Amoco had a possessory and utility interest in the platinum pursuant to its lease with DBL Trading, we predict that the courts of New York would not allow Amoco—as the issuer of the holding certificates—to hide behind that interest to avoid its obligations to release the platinum upon surrender of the certificates.

### E. Damages
#### 1. Evidentiary Issues
##### a. Admissibility of Bankruptcy Pleadings

Amoco argues that the district court erred in denying Amoco the opportunity to prove, allegedly via BNY's proof of claim submitted in the Drexel Burnham Lambert Group Bankruptcy proceedings, that "as of November 15, 1990, only the principal amount of $183,687.76 was 'owed to the Bank of New York' as a result of its loan to Drexel under the note for which the Amoco platinum was accepted as collateral, not the $550,000 BNY was seeking." Amoco's Brief at 37. Amoco essentially argues that BNY's damages were limited to the amount owed on the underlying loan—$183,687.76.

 Amoco's argument, however, confuses BNY's claim—for conversion of goods to which BNY was entitled under Article 7—with a claim that BNY might have brought against the collateral pursuant to the financing agreements. Under New York's version and interpretation of the U.C.C., proof that the platinum was delivered to the bailee and proof that the bailee refused, without legal excuse, to deliver the platinum on demand constitutes a *prima facie* case of conversion. *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 660, 431 N.Y.S.2d 372, 374, 409 N.E.2d 849, 851 (1980); *General Foods Corp. v. Pittston Warehouse, Corp.,* 110 A.D.2d 520, 521, 487 N.Y.S.2d 744, 746 (1st Dept.1985).

 Recovery in an action for conversion is the full value of the converted property. *General Foods,* 110 A.D.2d at 521–22, 487 N.Y.S.2d at 746 ("where the warehouseman simply refuses to return the bailed property and does not provide any explanation for its refusal, the plaintiff will be entitled to collect the full value, without more").

The First Department in *National Dairy Prod. Corp. v. Lawrence Am. Field Warehouse Corp.*, 22 A.D.2d 420, 255 N.Y.S.2d 788 (1st Dept.1965), observed that, as a "general rule[,] ... one having a special right to immediate possession may recover the full value of the converted property from the wrongdoer and then account to the owner of the remaining proprietary interest for the surplus of market value over the special interest." *Id.* 255 N.Y.S.2d at 801. The First Department went on, however, to recognize an exception to this "general rule" in "special circumstances where justice requires that the owner of a special interest recover only for the harm suffered." *Id.* The First Department further observed that "[t]here is some authority ... that the special owner's recovery must be limited whenever the converting defendant is in 'privity' with the owner of the remaining proprietary interest." *Id.* (citing *Davis v. Bliss*, 187 N.Y. 77, 84–86, 79 N.E. 851, 853–54 (1907); 56 Am.Jur., Warehouses § 215). The First Department then modified the Supreme Court's award of summary judgment, granting summary judgment on liability only and remanding the case for an assessment of damages. The Court of Appeals, however, reversed the Appellate Division and reinstated the judgment of the Supreme Court. *Procter & Gamble v. Lawrence Am. Field Warehouse Corp.*, 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965). The Court of Appeals wrote, "[a] warehouseman is liable in this State to the holder of the warehouse receipt for the full value of the merchandise, even where the holder of the receipt has only a special interest in the property." *Procter & Gamble*, 16 N.Y.2d at 355, 266 N.Y.S.2d at 793, 213 N.E.2d at 878–79 (citing *Einstein v. Dunn*, 61 A.D. 195, 70 N.Y.S. 520, 524–25 (1st Dept.1901), *aff'd* 171 N.Y. 648, 63 N.E. 1116 (1902); *Mechanics & Trader's Bank v. Farmers and Mechanics' Nat'l Bank*, 60 N.Y. 40, 52 (1875)). The Court of Appeals continued,

> it is incumbent on the party entitled to possession to account for the surplus, if any to the owners of other interests in the goods..... The difficulty, as we view it, with the reasoning of the Appellate Division is that it prejudges the rights and liabilities between plaintiff and Allied [ (a potential buyer of the goods in question who had made a down payment on the goods) ] without Allied's being before the court, and gives the benefit to defendant without recourse by plaintiff to protect itself against whatever personal liability plaintiff might be under to return part of the deposit to Allied or its trustee in bankruptcy.... [P]laintiff may recover for the full value of the bailed merchandise even if plaintiff's interest consisted merely in having a lien upon the bailed [goods] to secure the balance of the purchase price which Allied had agreed to pay..... [W]here there has been conversion of merchandise, the holder of the warehouse receipt is entitled to recover for the full value of the merchandise, and the holder of the receipt must then fulfill his obligations to other contracting parties who were not, themselves, entitled to possession of the merchandise at the time of its conversion.

*Procter & Gamble*, 16 N.Y.2d at 355–58, 266 N.Y.S.2d at 793–95, 213 N.E.2d at 878–80. To be sure, the facts of the *Procter & Gamble* case are somewhat different from the facts in this case. Most importantly, the plaintiff in *Procter & Gamble* was the bailor, not, as in this case, the pledgee. We find, however, that the Court of Appeals would apply the same analysis were the plaintiff the pledgee of warehouse receipts rather than the bailor. In *Procter & Gamble*, the Court of Appeals felt compelled to distinguish *Corn Exch. Bank v. American Dock & Trust Co.*, 163 N.Y. 332, 57 N.E. 477 (1900). In *Corn Exch. Bank*, the Court of Appeals held that a bank that held warehouse receipts as collateral to secure a loan could only collect from the defendant warehouseman the amount of the indebtedness on the loan, not the full value of the goods described in the warehouse receipts. The Court of Appeals in *Procter & Gamble* distinguished *Corn Exch. Bank* not on the grounds that the plaintiff was a pledgee rather than the bailor, but on the grounds that because the goods described in the warehouse receipts never existed, there was never a conversion. *Procter & Gamble*, 16 N.Y.2d at 356–57, 266 N.Y.S.2d at 794, 213 N.E.2d at 879–80. We find, therefore, that New York courts would allow

the pledgee of duly negotiated warehouse receipts to recover the full value of the goods described therein. Whilst the Bank of New York would be accountable to Drexel's trustee in bankruptcy for any surplus, whether there is, in fact, any surplus is not relevant to the question whether Amoco is obliged to deliver the platinum to the Bank of New York.

In this case, there was sufficient documentary evidence to establish that the platinum was delivered to Amoco; that Amoco issued negotiable documents of title covering the platinum; that DBL Trading duly negotiated the holding certificates to BNY; and that BNY, as holder in due course of the holding certificates, demanded the platinum from Amoco. In addition, Amoco failed to offer a proper excuse for refusing BNY's demand. Amoco argues that, pursuant to N.Y.U.C.C. § 7–603, it was entitled to a reasonable amount of time to sort out conflicting claims to the platinum. The district court considered this argument but found that, under the circumstances, Amoco's refusal was unreasonable. Amoco argues that it refused to surrender the platinum to BNY on the grounds that it was unsure whether, upon surrender, it might later be liable to DBL Trading or some other party claiming an interest in the platinum. These concerns regarding the potential claims of other parties are insufficient to excuse Amoco's failure, however. The U.C.C. provides that *"[i]f more than one person claims title or possession of the goods,* the bailee is excused from delivery until he has had a reasonable time to ascertain the validity of the adverse claims...."* N.Y.U.C.C. § 7–603. Because no other person actually claimed title or possession of the goods, § 7–603 simply does not apply. Thus, the two cases relied upon by Amoco are readily distinguishable. In both *Northwestern Nat'l Sales, Inc. v. Commercial Cold Storage, Inc.,* 162 Ga.App. 741, 741–42, 293 S.E.2d 30, 31–32 (1982), and *Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 696 F.2d 359, 363 (5th Cir.1983), the bailee received actual notice from a third party of a claim to title or possession of the goods. Moreover, under the U.C.C., "[a] bailee who in good faith including observance of reasonable commercial standards has received goods and

delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this Article is not liable therefor." N.Y.U.C.C. §. 7–404. Section 7–404 applies "even though the person from whom [the bailee] received the goods had no authority to procure the document or to dispose of the goods." Hence, Amoco's concern over the fact that "the Drexel trader who had arranged the leases contacted the Amoco employee responsible for the leases and asked for early termination of a lease on the ground the leased metal actually belonged to a third party," Amoco's Brief at 44–45, does not render its failure to deliver reasonable.

We find that because BNY made out a *prima facie* case of conversion, BNY was entitled to the full value of the converted property at the time of conversion—the date its demand was refused. Therefore, the amount owed to BNY by DBL Trading on the underlying note was immaterial to BNY's damages and properly excluded by the district court.

### b. Admissibility of Mitigation Evidence

Amoco argues that BNY should have mitigated damages by selling platinum futures contracts and that the district court erroneously refused to admit mitigation evidence. Amoco cites no case law directly on point, but essentially argues that under the law of New York, a plaintiff in a conversion action has a duty to mitigate. BNY, like Amoco, has found no cases directly on point. BNY does, however, cite one case in which a court held that a bailor under Article 7 had no duty to mitigate. *Industrial Welding Supplies, Inc. v. Atlas Vending Co., Inc.,* 276 S.C. 196, 277 S.E.2d 885, 887 (1981).

Generally, the duty to mitigate is a limitation on consequential damages. *See* N.Y.U.C.C. § 2–715(2)(a). BNY is not seeking consequential damages. Rather, it is seeking the value of the platinum on the date its demand was refused. *See* 2 White & Summers, *Uniform Commercial Code* § 21–3, at 142. Moreover, it would appear that consequential damages are not available under Article 7. The U.C.C. provides that "neither consequential or special nor penal

damages may be had except as specifically provided in this Act or by other rule of law." N.Y.U.C.C. § 1–106(1). Nothing in Article 7 specifically provides for consequential damages. Further, New York courts have held that in New York "[t]he usual measure of damage, in event of nondelivery of goods by a bailee, is the market value on the date of the conversion." *Procter & Gamble,* 16 N.Y.2d at 352, 266 N.Y.S.2d at 790, 213 N.E.2d at 876–77 (citing *McIntyre v. Whitney,* 139 A.D. 557, 124 N.Y.S. 234 (1st Dept. 1910), *aff'd,* 201 N.Y. 526, 94 N.E. 1096 (1911)). Thus, neither the U.C.C. nor the law of New York expressly provides for consequential damages in actions against warehousemen for failure to deliver. *But see* 2 White & Summers, *Uniform Commercial Code* § 21–3, at 142 ("upon proper proof the plaintiff should recover such consequential damages and ... would cite 1–103 as the source of another 'rule of law' (the common law) permitting recovery under 1–106"). Because, under the U.C.C., the duty to mitigate is generally a limitation on consequential damages and because BNY does not seek consequential damages, we decline to impose a duty to mitigate upon the holder of a duly negotiated document of title whose demand for the goods covered by the document was improperly refused.

■ Amoco essentially urges this court to hold that the holder of a negotiated document of title has a duty to "insure" the goods against risks associated with non-delivery by the bailee.[7] This proposal, however, raises a number of potential problems: Is the holder to purchase the hedging contracts before or after demand has been made? If after, how soon after? How long a term should the hedging contracts have? How often must they be renewed? Is the cost of entering the hedging transaction recoverable as part of incidental damages? It is difficult for the holder to resolve some of these problems on its own because it cannot control whether the bailee will refuse to deliver or, if the bailee refuses, the holder cannot control how long the bailee will continue to refuse. Because

the bailee controls whether and when the goods are delivered in response to the holder's demand, the costs of "insuring" against price declines following the failure to deliver should be placed on the bailee, not the bailor. Forcing the bailor to bear these costs would introduce an inefficiency into commercial practices—something that runs directly contrary to the purposes and policies of the U.C.C. Therefore, in the absence of a claim for consequential damages, we believe that the courts of New York would not impose a duty to mitigate upon the holder of a duly negotiated document of title whose demand for delivery is improperly refused. Because BNY had no duty to purchase financial contracts hedging against the risk of a decline in the value of the platinum following Amoco's improper refusal of BNY's demand for delivery, the district court properly excluded evidence pertaining to such contracts.

### 2. Calculation Issues

#### a. Date of Demand

■ Amoco also argues that because BNY did not demand immediate possession of the platinum until the date it filed its complaint, the district court erred in calculating damages based on the price of platinum on February 15, 1990, instead of March 1990 when, Amoco argues, BNY first clearly demanded the platinum.

The New York Court of Appeals has written that "the loss is to be measured as of the time of the conversion." *Procter & Gamble,* 16 N.Y.2d at 352, 266 N.Y.S.2d at 791, 213 N.E.2d at 877. The date of conversion is the date at which demand was made and refused. The district court found that demand for the platinum was first made on February 15, 1990. Letter from Barbara A. Hyland, BNY, to E.A. Sloss, Amoco of 2/15/90, reprinted as Appendix Exhibit D. That letter stated:

> As discussed this morning, we request that you transfer the following material which you are currently holding for the account or order of Drexel Burnham Lambert

---

7. Selling futures contracts would have insured BNY against price declines in the platinum. We note that this "insurance" could have been purchased by Amoco as well. The question before

us, therefore, is not only whether there is a duty to insure against a decline in the value of the goods following a refusal to deliver but also, if there is such a duty, who bears it?

Trading Corporation to the account of The Bank of New York....

The letter then proceeds to identify the specific holding certificates under which BNY claimed the platinum. Attached to the letter were copies of the front and back of each of the holding certificates. Amoco argues that it was confused by this letter because its final paragraph stated:

> Please send the holding certificates which are now to the order of The Bank of New York directly to my attention under telefax advice.

Although this paragraph is puzzling—because BNY had the holding certificates and Amoco did not—the district court determined that the letter constituted a demand for the platinum. We find that taken as a whole the letter of February 15, 1990 constituted a demand for delivery of the platinum. Hence, the district court properly calculated damages with reference to the value of the platinum on February 15, 1990.

### b. Interest

Amoco argues that the district court should not have awarded BNY prejudgment interest from the date of the filing of their complaint in addition to the award of $550,-000 in damages. Amoco argues that under the partial settlement agreement, BNY may not recover damages, *including prejudgment interest*, in excess of $550,000. The Settlement Agreement provided:

> The attorneys for the parties shall enter into a stipulation and order, in the form annexed as Exhibit A, ... (ii) limiting any recovery of damages by BNY from Amoco in the Action, or in any other action based on any of the allegations set forth in the Complaint in the Action, to an amount not to exceed five hundred fifty thousand dollars ($550,000); and (iii) deleting all claims in the Action for punitive damages.

Settlement Agreement, reprinted at S Appendix. The district court determined that the agreement precluded any award of interest on BNY's damages that accrued prior to the date of the agreement. Thus, the district court determined that BNY was not entitled to interest on the sum of $11,624,067.00 (the value of the platinum on February 15, 1990) from February 15, 1990, through April 4, 1990 (the date of the settlement agreement). The district court then determined that BNY could recover prejudgment interest on $550,-000.00 from April 4, 1990.

Amoco relies on *Petosa v. City of New York,* 63 A.D.2d 1016, 1017, 406 N.Y.S.2d 354, 355–56 (2d Dept.1978), for the proposition that a stipulated limit on damages precludes the plaintiff from recovering prejudgment interest when damages plus interest would exceed the stipulated limit. That case, however, only held that the plaintiff was precluded from recovering prejudgment interest on damages from the date of the injury until the date of the stipulation. *Petosa* did not hold that the plaintiffs could not recover prejudgment interest from the date of the stipulation.

 Under the law of New York, a settlement agreement in writing between parties represented by counsel is binding and, essentially, a contract. N.Y.Civ.Prac.L. & R. § 2104 (McKinney 1976 & Supp.1994); *Novak & Co., Inc. v. New York Convention Ctr. Dev. Corp.,* 202 A.D.2d 205, 206, 608 N.Y.S.2d 219, 219 (1st Dept.1994); *Davis v. Sapa,* 107 A.D.2d 1005, 1006, 484 N.Y.S.2d 568, 570 (3d Dept.1985). As such, it is "subject to the rules governing the construction of contracts." Joseph M. McLaughlin, Practice Commentaries, N.Y.Civ.Prac.L. & R. C2104:1 p. 560; *see also Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1032 (1979) (interpreting settlement agreement pursuant to rules governing the construction of contracts). Generally, the agreement "will be construed in accordance with the intent of the parties." *Davis,* 107 A.D.2d at 1006, 484 N.Y.S.2d at 570. Unambiguous words and phrases will be construed according to their plain meaning. *State v. Warren Bros. Co., Inc.,* 190 A.D.2d 728, 730, 593 N.Y.S.2d 308, 310 (2d Dept.1993). Where, however, the meaning of a word or phrase is ambiguous, the courts of New York will examine the record as a whole in an effort to interpret the agreement so as to effectuate the intent of the parties. *Kraker v. Roll,* 100 A.D.2d 424, 436, 474 N.Y.S.2d 527, 535–36 (2d Dept.1984); *see also Novak,* 202 A.D.2d at 205–06, 608

N.Y.S.2d at 219. Further, "in construing contracts, the court should reach for fair and reasonable results." *Kineon v. Bluegrass Elkhorn Coal Corp.*, 121 A.D.2d 980, 982, 505 N.Y.S.2d 624, 625 (1st Dept.1986). Where one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent. *See Estate of O'Brien v. Town of Mamaroneck*, 20 N.Y.2d 587, 594, 285 N.Y.S.2d 843, 848, 232 N.E.2d 844, 847 (1967); *Kraker*, 100 A.D.2d at 438, 474 N.Y.S.2d at 536. Rather, where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson. *See Lama Holding Co. v. Shearman & Sterling*, 758 F.Supp. 159, 163 (S.D.N.Y.1991); *Merrill Lynch Commodities Inc. v. Richal Shipping Corp.*, 581 F.Supp. 933, 939 n. 14 (S.D.N.Y.1984); *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 254 N.Y. 179, 183, 172 N.E. 462, 463 (1930).

 Ordinarily, if prejudgment interest were included within the meaning of the term "damages," then one would expect reasonable business people to agree to a cap on damages that is higher than the cap to which they would agree if prejudgment interest were excluded from the meaning of the term "damages." The trouble is that reasonable business people could not know with precision how the inclusion of prejudgment interest should affect the level of the cap on damages. After all, neither party could know with precision when final judgment would be rendered. Therefore, as of the date of the stipulation, neither party could know with precision how much prejudgment interest to include within the cap on damages. Absent a clear intent to include prejudgment interest within the meaning of "damages," we think that reasonable businesspeople faced with uncertainty over how much prejudgment interest there would be would exclude prejudgment interest from the meaning of "damages." Further, the date of final judgment is, to some extent, a function of the parties' conduct during litigation. In the absence of a clear intent to include prejudgment interest from the date of the stipulation in the amount of stipulated damages, courts should not interpret the settlement agreement so as to create incentives for the defendant to delay while enjoying the free use of the plaintiff's money. *See also Lowy and Donnath, Inc. v. City of New York*, 98 A.D.2d 42, 469 N.Y.S.2d 760 (1st Dept.1983), *aff'd*, 62 N.Y.2d 746, 476 N.Y.S.2d 830, 465 N.E.2d 369 (1984) (courts should avoid constructions that place one party at the mercy of the other). We conclude that under the reasonable expectations of the ordinary businessperson, use of the word "damages" was not intended to include prejudgment interest. We therefore affirm the district court's award of prejudgment interest to BNY.

IV. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed, with costs to BNY.