Benjamin A. REED, a minor, By and Through Lavern A. REED and Linda L. Reed, his parents and natural guardians, and Lavern A. Reed and Linda L. Reed, individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 86–1082–CIV.

United States District Court, S.D. Florida.

Aug. 10, 1988.

Ira Leesfield, Leesfield and Blackburn, Miami, Fla., and Frank Ladenburg, Troup, Christnacht, Ladenburg & McKasy, Tacoma, Wash., for plaintiffs.

U.S. Atty. and Jeanne Mullenhoff, Asst. U.S. Atty., Miami, Fla., and U.S. Dept. of Justice, Joanne I. Schwartz, Civil Torts, Washington, D.C., for U.S.

## AMENDED MEMORANDUM DECISION

SCOTT, District Judge.

"It is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same, between private individuals."

Abraham Lincoln

This dispute arises over a settlement agreement.[1] The government seeks to avoid the terms of the agreement. Plaintiffs urge the court to enforce the terms. While this controversy involves close to two million dollars, its significance transcends mere money. The importance of this case lies in the principles it brings into play—commitment and integrity.

### I. BACKGROUND

At a United States Air Force Hospital, Benjamin Reed was born quadriplegic, deaf, blind, suffering from renal failure, seizures and other medical complications. Medical negligence by Air Force physicians was suspected. The child's condition was closely monitored by the parties, but from the outset, his fate was sealed. It was only a matter of time until Benjamin Reed died.

Unable to resolve the matter amicably, Plaintiffs, Lavern A. Reed and Linda L. Reed, brought this action on behalf of their minor son Benjamin, alleging medical malpractice against the United States under the Federal Torts Claims Act ("FTCA").

---

**1.** When the settlement dispute arose, the Court immediately established a stringent discovery, briefing and trial schedule in order to bring this controversy quickly to issue and defuse the natural antagonism. Evidentiary hearings occurred on March 13, 1987 and March 20, 1987, wherein the parties had a full and complete opportunity to present their evidence. *See Mid–South Towing Co. v. Har–Win, Inc.,* 733 F.2d 386 (5th Cir.1984) (remanding for purposes of an evidentiary hearing to determine if counsel actually had authority to settle the case); *Autera v. Robinson,* 419 F.2d 1197, 1200 (D.C.Cir.1969) (providing that parties are entitled to an evidentiary hearing with respect to issues of fact arising from motion for entry of judgment in accordance with agreement of the parties).

Specifically, the complaint alleges that the Defendant, United States of America, through the United States Air Force Hospital "undertook to provide prenatal pregnancy as well as delivery care for Linda L. Reed and pre and post-natal care for her newborn son, Benjamin A. Reed; said care was negligently performed and fell beneath the accepted standard of care....".

Recognizing its legal predicament as well as its moral obligation, the Air Force undertook settlement negotiations during the summer of 1986. The negotiations contemplated joint resolution of (a) the parents' claim; (b) Benjamin's individual claim; (c) provision for reversionary medical expense and care; and (d) attorney's fees. The parties communicated telephonically and in person several times. Major Michael L. Fox, the Chief of Medical Law for the United States Air Force, originally began negotiating for the government. Major Fox was desirous of settling, at least partly motivated by the child's welfare and the family's predicament. Fox was relieved in early October, 1986 by Ms. Joanne Schwartz of the Department of Justice, Civil Division, who assumed control of the settlement negotiations on the government's behalf.[2]

By letter dated November 3, 1986, Plaintiffs' attorney, Mr. Frank Ladenberg, offered a detailed settlement proposal to the United States. After becoming concerned about an impending trial date (then set for February 9, 1987), Ladenburg wrote to Schwartz indicating that unless there existed between the parties an approved settlement agreement by November 17, 1986, "all bets are off and the Plaintiffs will proceed to trial." Ms. Schwartz wrote back to Ladenburg by letter dated November 5, 1986, presenting Plaintiffs with a detailed "alternate proposal." Several conversations regarding final settlement took place between the parties and Ladenburg orally accepted the government's proposal on November 12, 1986.

The settlement agreement required four different levels of review and authorization within the Department of Justice. Two such levels of approval had been obtained when the parties appeared in open court in Miami, Florida for a status conference on November 18, 1986. At that hearing, the following dialogue took place:

THE COURT: Where do we stand, counsel, respectively on the question of settlement?

MS. SCHWARTZ: Your Honor, a settlement was reached between counsel on November 12, 1986 in the evening. It has been presented to the Department of Justice for final approval.

As of last night at 4:30 it was in the hands of the Assistant Attorney General. It requires his approval and the approval of the Deputy Attorney General before it can be final.

We expect—we hope that will be forthcoming in a very short time.

THE COURT: How much time are we talking about?

MS. SCHWARTZ: It's very difficult for me to estimate. I hope we are talking about a matter of days.

The four level authorization process was completed when Arnold J. Burns, Deputy Attorney General, gave his final approval to the structured settlement agreement on November 26, 1986.[3] According to the memo signed by Mr. Burns:

Acceptance of the plaintiffs' offer in compromise of the above-captioned action for a structured settlement in an amount not to exceed $1,999,900 to be paid by the United States is hereby approved.

On the morning of November 28, 1986, Ms. Schwartz called Mr. Ladenburg to inform him that the terms of the structured settlement had received final government approval. Ladenburg immediately sent a speed memo to Schwartz confirming that the settlement had received final approval. Government counsel simultaneously pre-

---

**2.** A chronology of events culminating in the consummation of the contract is contained in an appendix to this Memorandum Decision.

**3.** *See* 28 C.F.R. § 0.161 (7–1–86 Ed.), which provides in pertinent part: "(b) The Deputy Attorney General is authorized to exercise the settlement authority of the Attorney General as to all claims on behalf of, and all claims against, the United States."

pared a "Stipulation for Compromise Settlement." [4]

By letter to Ladenburg dated December 1, 1986, Ms. Schwartz confirmed the November 28, 1986 conversation with Ladenburg, indicating that final approval of the proposed settlement was received. Ms. Schwartz also enclosed the Settlement Stipulation, which memorialized the agreement for the parties' signatures. As stated in the government's cover letter,

This letter will confirm our telephone conversation of November 28, 1986. As I indicated, final approval of the proposed settlement in the above-captioned action was received from the Deputy Attorney General on November 28, 1986. Therefore, I enclose for your signature and the signature of your clients the Stipulation for Compromise Settlement to be presented to the Court at the status conference currently scheduled for December 4, 1986.

On November 28, 1986, in the early evening, the child died.

Plaintiffs now seek to enforce the agreement reached between counsel prior to the child's death. The government opposes the settlement agreement taking a shot-gun approach of various fall-back positions and defenses. Each contention will be discussed in order.

## II. SUBJECT MATTER JURISDICTION EXISTS

■ The government initially raises two grounds contesting the Court's subject matter jurisdiction. First, Defendant argues that this action-abated, pursuant to Fla.Stat. § 768.20, on November 28, 1986, the date of Benjamin Reed's death. Section 768.20 provides that a personal injury action is eclipsed by the injured's death. The abatement principles of Section 768.20, however, do not apply to this case because the Court is not faced with a pending personal injury claim. Rather, the present motion to enforce the settlement agreement has evolved into an action arising out of breach of contract, and actions *ex con-*

*tract* survive the death of the plaintiff. 1 Fla.Jur.2d *Actions* § 77 (1977). *See also* Fla.Stat. § 46.021.

■ Secondly, Defendant argues that since the underlying dispute is now one of contract in excess of $10,000.00, the Court lacks jurisdiction under the provisions of the Tucker Act, 28 U.S.C. § 1346(a)(2) and § 1491, which vests the United States Court of Claims with exclusive jurisdiction over contract claims against the United States in excess of $10,000. Again, the Court finds Defendant's argument unpersuasive.

In the present case, federal subject matter jurisdiction is founded on 28 U.S.C. § 1346(b) of the FTCA, an independent basis for subject matter jurisdiction in an action for personal injury. This matter then evolved into one for the enforcement of a settlement agreement after jurisdiction was properly asserted under Section 1346(b) of the FTCA. Since this action was not originally brought to enforce a contract with the United States, the Tucker Act does not apply. The motion to enforce the settlement agreement, although ancillary to the original action, is not within the exclusive jurisdiction of the Claims Court. *See White v. U.S. Department of Interior,* 639 F.Supp. 82, 85–86 (M.D.Pa.1986).

Overshadowing this argument is the illogical and unfair result it would permit. If this contention were given moment, the government could summarily divest the court of subject matter jurisdiction by merely refusing to perform its part of a settlement agreement. Such jurisdictional manipulations cannot be allowed. Moreover, this contention directly conflicts with the well-established principle that a district court possesses the inherent power to "summarily enforce a settlement agreement entered into by litigants while litigation is pending before it." *Massachusetts Cas. Ins. Co. v. Forman,* 469 F.2d 259, 260 (5th Cir.1972) (citing *Cia Anon Venezolana De Navegacion v. Harris,* 374 F.2d 33 (5th Cir.1967)). *See Kent v. Baker,* 815

---

**4.** The "Stipulation for Compromise Settlement" consisted of seven pages and eleven parts with various subparts.

F.2d 1395 (11th Cir.1987) (per curiam) (stating that "a district court has jurisdiction to enforce a settlement agreement ... when a party refuses to comply with the agreement before the case has been dismissed.") (citations omitted). The Court, therefore, concludes that jurisdiction exists to determine the enforceability of the settlement agreement.[5]

## III. THE SETTLEMENT AGREEMENT

■ Any consideration of the settlement agreement must commence with the recitation of two basic rules of analysis (1) compromises of disputed claims are favored by the courts, *Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33, 35 (5th Cir.1967) (*citing Williams v. First National Bank of Pauls Valley*, 216 U.S. 582, 30 S.Ct. 441, 54 L.Ed. 625 (1910); *Gilliam v. Alford*, 69 Tex. 267, 6 S.W. 757 (1887)).[6] *See also United States v. McInnes*, 556 F.2d 436, 441 (9th Cir.1977) (stating that courts "are committed to the rule that the law favors and encourages compromise settlements.") (*citing Richards Construction Co. v. Air Conditioning Co. of Hawaii*, 318 F.2d 410 (9th Cir.1963)); and (2) "[w]here the parties acting in good faith, settle a controversy, the courts will enforce the compromise without regard to what result might, or would have been, had the parties chosen to litigate rather than settle." *Cia Anon Venezolana*, 374 F.2d at 35 (*citing Hennessy v. Bacon*, 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605 (1890)). With these principles in mind, we turn to the next series of government contentions.

**5.** Because it is axiomatic that a court may enforce a settlement agreement after it has properly obtained subject matter jurisdiction, defendant's claim that the court has jurisdiction only to award damages is likewise rejected.

**6.** As stated by the court in *Autera v. Robinson*, 419 F.2d 1197, 1199 (D.C.Cir.1969):

Voluntary settlement of civil controversies is in high judicial favor. Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they certainly should. When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issues; the court is spared

### A. *The Settlement is Final*

■ The threshold issue is whether a final settlement was reached by the parties. Florida contract law governs this analysis. *Florida Education Assoc., Inc. v. Atkinson*, 481 F.2d 662, 663 (5th Cir. 1973). An objective test is used to determine the parties' intent. *Robbie v. City of Miami*, 469 So.2d 1384, 1385 (Fla.1985).

Government counsel announced in open court at the November 18, 1986 status conference that settlement terms had been reached. Based on the lengthy oral and written communications between counsel and the fact that the oral agreement had already received approval from two of the four required levels within the Justice Department, the Court concludes that there was a manifestation of mutual assent by the parties on November 18, 1986 to be bound by the oral agreement. *See United States v. McInnes*, 556 F.2d 436, 440 (9th Cir.1977). As in *Village of Kaktovik v. Watt*, 689 F.2d 222, 234 (D.C.Cir.1982), "it is difficult to imagine that the government could have believed that there was never a settlement agreement."

A condition precedent to the binding effect of the settlement agreement was its approval by the Deputy Attorney General, the fourth and final level of authorization required. Mr. Arnold Burns, the Deputy Attorney General, had authority to bind the Government[7] and did so on November 26, 1986. *See* memo signed by Mr. Burns. The condition precedent to final approval was, therefore, fulfilled two days prior to the infant's death and the settlement agreement became binding on November 26, 1986.[8] *See* E.A. Farnsworth, *Con-*

the burdens of a trial and the preparation and proceedings that must forerun it. By the same token, there is everything to be gained by encouraging methodology that facilitates compromise. (citations omitted).

**7.** *See infra* note 3. *See also White v. United States*, 639 F.Supp. 82 (M.D.Pa.1986).

**8.** Even if the Court were to construe the oral settlement agreement as an offer by Mr. Ladenburg, the agreement became binding prior to the infant's death. On the morning of November 28, 1986 Joanne Schwartz "accepted" the "offer" by telephonic representation to Mr. Ladenburg, and then followed it by written confirmation.

*tracts,* §§ 8.1, 8.2 (1982); *Cohen v. Roth-man,* 127 So.2d 143 (3d DCA Fla.1961), *cert. discharged* 138 So.2d 328 (Fla.1962).

The terms of the settlement agreement are contained in the seven page document entitled "Stipulation for Compromise Settlement," which is a written manifestation of the oral agreement. Ms. Schwartz sent this agreement, prepared by the government, to Mr. Ladenburg on December 1, 1986. Earlier on November 20, 1986, the Reeds had executed an affidavit reflecting their acceptance of the identical terms. These subsequent events merely serve to confirm the manifestation of mutual assent expressed at the status conference. In short, the Court concludes that a settlement agreement was achieved.

### B. *The Settlement Is Not Indefinite*

■ The government argues that the settlement agreement does not exist because no agreement was reached as to all of its "essential terms." Specifically, the government states that the parties failed to negotiate both the terms of a medical trust for the benefit of the infant and the exact cost of settlement. The objective manifestations of the parties demonstrate, however, that the bargaining as to the material elements of the settlement was indeed final.

An initial written settlement agreement was sent by Mr. Ladenburg to Ms. Schwartz in November, 1986. By its terms, the trust provided for: (1) monthly payments to the parents; (2) reasonable and necessary medical expenses; (3) transportation costs; (4) respite care; (5) the purchase of a van; (6) alterations of the Reeds' home; and (7) medical equipment. That a trustee had yet to be named or his specific powers outlined is of little consequence. These minor details were left to be worked out by the parties. Section 10 of the Stipulation for Compromise Settlement, drafted by the government, provides for such a continuance. It provided in relevant part:

> All parties agree to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Stipulation for Compromise Settlement, and which are not inconsistent with its terms.

The exact details of the trust were, in fact, later worked out in painstaking detail in a twenty-nine page trust document.

Similarly, the failure to set the exact cost of the settlement because annuities, which fluctuate in price, had yet to be purchased, is not a material element of the agreement. The Stipulation for Compromise Settlement itself specifies the sums to be paid under each of its provisions, and the Deputy Attorney General has agreed to pay a total of $1,999,900. These facts unequivocally establish that the parties reached a final agreement on all material terms; and, therefore, the agreement does not fail for indefiniteness.

### C. *The Agreement Does Not Fail Absent Court Approval*

■ The government next argues that the settlement agreement does not exist because the Court has not approved the agreement on behalf of the minor, as is required by Fla.Stat. § 744.387(3)(a). An agreement to settle on behalf of a minor is, however, reached prior to court approval. *Nixon v. Bryson,* 488 So.2d 607 (Fla. 3d DCA 1986) *rev. denied,* 494 So.2d 1152 (Fla.1986). The government cannot rescind the agreement pending court approval. *Village of Kaktovik v. Watt,* 689 F.2d 222, 234 (D.C.Cir.1982) (Greene, J., concurring in part and dissenting in part). Further, the agreement is only voidable as to the minor. *Nixon,* 488 So.2d at 609. Indeed, the purpose of requiring court approval is to protect the minor's interest—not to allow another party to renege. Accordingly, the government may not rescind the agreement while the issue of its approval is before the court.

### D. *The Agreement Need Not Be Signed To Be Binding*

■ The government further argues that the settlement agreement is unenforceable because the parties never signed it. An enforceable settlement agreement may, however, be reached orally. *Capez-*

*zuto v. Elias Engineering and Testing, Inc.,* Case No. 87–0052–ORL, slip op., (M.D. Fla. April 12, 1987) (*citing Strange v. Gulf & South American S.S. Co., Inc.,* 495 F.2d 1235, 1236 (5th Cir.1974)). All that is required is that the terms be clear, definite and capable of proof. *Blum v. Morgan Guaranty Trust Co. of New York,* 709 F.2d 1463 (11th Cir.1983). In addition, the physical act of signing a document is a mere formality where the parties clearly intend to be bound. *International Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49 (2d Cir.1979). *See United States v. McInnes,* 556 F.2d 436, 441 (9th Cir.1977) (in action to enforce settlement agreement with government, signing of stipulation not required).

In this case, the parties indicated a clear intent to be bound. This fact is evidenced by Ms. Schwartz's own admission on November 18, 1987 that a settlement had been reached. Moreover, the settlement agreement was not contingent on the execution of the stipulation, but rather upon the final approval of the Deputy Attorney General. The government has not presented the Court with any persuasive evidence indicating that legal obligations would be postponed until the stipulation could be signed.

## IV. IMPOSSIBILITY DOES NOT EXCUSE GOVERNMENT'S PERFORMANCE

The government argues that its performance under the settlement agreement should be excused due to impossibility, in light of Benjamin Reed's death. The agreement includes the purchase of annuities and the creation of an irrevocable medical trust funded through annuities for the benefit of the child. The government now argues that because an annuity cannot be purchased conditioned on the life of a dead person, it is impossible to perform the settlement agreement. In essence, the government is attempting to back out of the entire agreement because one portion, the purchase of annuities, cannot be performed.

The government *has,* however, already complied with the annuity provision because the death of the infant, the measuring life of the trust, renders performance moot. Moreover, no other portion of the agreement is made impossible by the infant's death. The consideration for the agreement, the plaintiffs' forbearance from suit, is not affected. Most telling, the government clearly foresaw the possibility of Benjamin's premature death.

Benjamin Reed was horribly ill from birth. For his entire life, Benjamin was treated in military hospitals under constant supervision by Air Force doctors. The words "extremely guarded" were used in describing Benjamin's prognosis. In short, the government knew from day one that the boy could die at any moment. Mercifully, he died after only sixteen months.

For this reason, the government actively negotiated an agreement which contemplated a reversionary trust in the event of his death. Specifically, the government sought and obtained as part of the bargain that upon Benjamin's death, the proceeds of the medical trust would revert back to the government. That provision excuses the government from initially funding the trust with $400,000 and from purchasing annuities valued at $300,512. In sum, the government receives the benefit of a $700,-000 savings under the terms of the reversionary medical trust.[9] We see nothing unconscionable about this; it was a wise and tactically thought out provision. How such a feature can be converted into a basis for repudiation of the entire contract defies legal logic as well as common sense. Accordingly, the infant's death does not excuse the government's performance under the agreement.

## V. THE EQUITIES DO NOT LIE WITH THE GOVERNMENT

Finally, the government argues that equity requires the Court to abstain from enforcing the agreement because it is unreasonable and punitive. Again, the Court fundamentally disagrees.

9. Stated another way, the medical trust provision, as contemplated by the parties, was clearly severable from the remainder of the contract.

The parties reached a settlement agreement after careful and detailed negotiations, which subsequently received final approval in advance of Benjamin's death. The terms were fair and equitable. The death of the tortured infant, after the agreement was finalized, does not defeat its performance. Indeed, allowing the government to arbitrarily and unilaterally refuse to perform its part of the bargain would be manifestly unjust.

As Judge Gesell observed in *Bernstein v. Brenner*, 320 F.Supp. 1080 (D.D.C.1970), "[t]he settlement in this instance was made by experienced attorneys and the courts have long recognized that arms-length dispositions of litigation, particularly settlements made through counsel by sophisticated litigants, cannot lightly be set aside merely because subsequent developments may indicate that the bargain made proved more beneficial to one party than the other." *Id.* at 1086. *See Strange v. Gulf and South American S.S. Co., Inc.*, 495 F.2d 1235, 1237 (5th Cir.1974); *Beecher v. Able*, 441 F.Supp. 426, 429 (S.D.N.Y.1977). Moreover, public policy favors the enforcement of settlement agreements. *See Pearson v. Ecological Science Corp.*, 522 F.2d 171 (5th Cir.1975) *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976).

■ Our law has long recognized that the principles of contract law apply with equal force when the government is a party. *In re Smoot*, 82 U.S. (15 Wall) 36, 21 L.Ed. 107 (1872). These principles apply whether the government's actions are presented in a civil or criminal setting. *See Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).[10]

When the United States government acts, as the embodiment of the collective conscience of our society, one must expect that the moral fibers of our nation—honor, integrity and commitment—will be reflected as a model to our citizens. The government has wholly failed its people by not upholding these deeply rooted ideals in this case. The government, more than any other party, must be held to honor its commitments. When the government fails, United States Courts must be prepared to enforce these commitments. We do so without hesitation in the instant case.

## VI. CONCLUSION

Upon careful consideration of parties written and oral argument and in light of the foregoing discussion, it is hereby

ORDERED and ADJUDGED as follows:

1) Defendant's Motion to Dismiss is DENIED.

2) Plaintiffs' Motion to Approve and Enforce the Parties' Settlement Agreement is GRANTED.

3) The Court finds that pursuant to Fla. Stat. § 744.387, the settlement was in the minor Plaintiff's best interest.

4) Plaintiffs' Motion for Substitution of Parties is GRANTED.

5) Plaintiff shall submit a proposed order and judgment enforcing the terms of this agreement within ten days.

6) The Court retains jurisdiction to effectuate this order.

DONE and ORDERED.

## APPENDIX

### CHRONOLOGY OF BENJAMIN J. REED v. UNITED STATES
### CASE NO. 86–1082–CIV–SCOTT

| Dates | Events |
|---|---|
| July 29, 1985 | Benjamin Reed's birth. |
| May 20, 1986 | Federal Tort Claim Action filed in Southern District of Florida. |

---

**10.** For example, this Circuit in *In re Arnett*, 804 F.2d 1200 (11th Cir.1986), recently stated that "[t]his circuit follows the principle enunciated in *Santobello* by requiring that the government adhere strictly to the terms of plea agreements.... Where the government has not honored a plea agreement, the fashioning of an appropriate remedy is left to the sound discretion of the court." *Id.* at 1204 (citations omitted).

| Dates | Events |
|---|---|
| September 30, 1986 | Settlement negotiations heat up. |
| October 15, 1986 | Department of Justice (DOJ) lawyers take over defense. |
| November 3, 1986 | Letter sent from Plaintiff's counsel (Frank Ladenburg) with settlement proposal and deadlines to DOJ. |
| November 5, 1986 | DOJ lawyer (Joanne Schwartz) counters with four-prong settlement proposal. |
| November 12, 1986 | Ladenburg accepts settlement offer on behalf of Plaintiffs. |
| November 18, 1986 | At status conference, the parties announce a settlement, subject to final approval by DOJ officials. |
| November 20, 1986 | Reeds execute affidavit accepting settlement. |
| November 26, 1986 | Deputy Attorney General Burns approves settlement; last level of approval achieved by DOJ. |
| November 28, 1986 | Telephone call from Schwartz to Ladenburg confirming consummation of agreement. Later that day, Benjamin dies. |
| December 1, 1986 | Letter from Schwartz to Ladenburg reiterating settlement and discussions of November 28, 1986. As part of the letter, Schwartz encloses "Stipulation for Compromise Settlement" memorializing the terms. The letter recites the identical terms of the affidavit executed by the Reeds. |