James OSTMAN, Plaintiff,

v.

ST. JOHN'S EPISCOPAL HOSPITAL, Peninsula Hospital Center and The Joseph P. Addabbo Family Health Center, Inc., Defendants.

The JOSEPH P. ADDABBO FAMILY HEALTH CENTER, INC., Third–Party Plaintiff,

v.

UNITED STATES of America, Third–Party Defendant.

ST. JOHN'S EPISCOPAL HOSPITAL, Third–Party Plaintiff,

v.

M. Chris OVERBY, Peter Hollis and Allan Hausknecht, Third–Party Defendants.

James OSTMAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 90–CV–4091 (JS), 91–CV–1446 (JS).

United States District Court, E.D. New York.

March 11, 1996.

Richard E. Shandell, Glaser, Shandell & Blitz, New York City, for plaintiff.

J. Edward McDonough, Bartlett, McDonough, Bastone & Monaghan, LLP., Mineola, NY, Kevan Cleary, Assistant United States Attorney, United States Attorney's Office, Brooklyn, NY, Kevin N. Natale, Steven D. Weiner, Martin, Clearwater & Bell, New York City, Michael N. Stevens, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, Thomas Reddington, Morris, Duffy, Alonso & Marulli, New York City, Peter Williams, Kopff, Nardelli & Dopf, New York City, for defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

In the instant related actions that have been consolidated for purposes of settlement, plaintiff James Ostman asserts personal-injury claims against several defendants, including the United States government. The plaintiff alleges that the defendants, through their agents, negligently failed to diagnose an epidural abscess in his cervical spine, complications of which eventually led to his paralysis.

Pending before the Court are motions filed by defendants St. John's Episcopal Hospital, Peninsula Hospital Center and The Joseph P. Addabbo Family Health Center, Inc. to confirm a settlement that was stipulated on the record before the Honorable John L. Caden, United States Magistrate Judge for the Eastern District of New York, on January 11, 1995, and to impose sanctions against those parties who have delayed or hindered the enforcement of the settlement. The plaintiff, in turn, has cross-moved to vacate the settlement. Alternatively, the plaintiff cross-moves to vacate the United States' putative claims for reimbursement of conditional payments made by Medicare on plaintiff's behalf, and to vacate putative liens asserted by the State of New York with respect to conditional Medicaid payments made on plaintiff's behalf subsequent to January 11, 1995.

For the reasons that follow, the Court confirms the settlement on the terms stipulated on the record before Magistrate Judge Caden, and construes the parties' settlement agreement as not having contemplated whether the United States, as an alleged tortfeasor, could assert any right of reimbursement with respect to Medicare payments made on the plaintiff's behalf. In addition, plaintiff's applications to vacate the claims asserted subsequent to January 11, 1995 by the State of New York for reimbursement of Medicaid payments, and by the United States government for reimbursement of Medicare payments, are denied. Finally, the parties' cross-motions for sanctions are denied.

## FACTUAL BACKGROUND

The cases at bar involve plaintiff James Ostman, who is a quadriplegic as a result of an untreated epidural abscess in the cervical spine that he incurred at age thirty-nine. The plaintiff alleges that, on May 25, 1988, upon complaining of pain in his chest, back, both arms and neck, he was taken by ambulance from The Joseph P. Addabbo Family Health Center, Inc. [the "Addabbo Health Center"] to Peninsula Hospital Center ["Peninsula"]. At the Addabbo Health Center, plaintiff was treated by a physician who was employed by the United States of America. Without the proper tests being performed upon him, plaintiff was sent home with a diagnosis of chronic back pain. On May 26, 1988, plaintiff returned to the Addabbo Health Center again complaining of neck pain. He was given Valium and released without a diagnosis being offered. On May 30, 1988, plaintiff reported to St. John's Episcopal Hospital Emergency Room complaining of difficulty in swallowing and pain in the throat. Again, the necessary and proper neurological tests were not performed. Plaintiff's medical condition subsequently deteriorated, and ultimately he became paralyzed from the neck down as a result of an undiagnosed epidural abscess in the cervical spine.

Following several months of negotiations, a formal Stipulation of Settlement was entered into by the parties, on record and in open Court, at a settlement conference held on January 11, 1995 before Magistrate Judge Caden [the "Settlement Conference"]. The transcript of this proceeding reflects the following:

MR. SHANDELL (counsel for plaintiff Ostman): It is hereby stipulated and agreed by and between the attorneys for the respective parties that the within action is hereby settled and on the following terms and conditions:

The action is settled for the total sum of two million dollars; sum of nine hundred and fifty thousand dollars is to be paid on behalf of St. John's Episcopal Hospital; the sum of seven hundred fifty thousand dollars is to be paid on behalf of the U.S.A.; the sum of three hundred thousand dollars is to be paid . . . on behalf of Episcopal Hospital Center.

Plaintiff will furnish . . . general releases and stipulations of discontinuance with prejudice in the usual form to the St. John's Episcopal Hospital, United States of America, Peninsula Hospital Center and Joseph P. Addabbo Family Health Center, Inc.

The plaintiff reserves his right to continue an action presently pending against the . . . third party defendants Hausknecht, Overby and Hollis.

MR. McDONOUGH (counsel for defendant St. John's Episcopal Hospital): Off the record, I think we should clarify that is in a state court action. Oh, forgive me, I didn't mean to be presumptuous.

MR. STEVENS (counsel for defendant Peninsula Hospital Center): In Queens which is currently pending, the Supreme Court of the State of New York County of Queens. Settlement is subject to final approval from Roger Marks, Executive Director St. John's Episcopal Hospital, who is presently out of the country.

Within 48 hours counsel for St. John's Episcopal Hospital will be in touch with Mr. Marks and convey his anticipated consent to all parties.

All cross claims and third-party complaints pending before this Court are hereby discontinued with prejudice and without costs.

*Said settlement is subject to any outstanding liens.* Should Mr. Marks not consent, this case is to be restored to this Court on the unopposed application of the plaintiff.

MR. McDONOUGH: But we have—it has been conveyed to us that, at least, as of today the plaintiff has indicated his willingness to accept that figure.

MR. SHANDELL: *Yes. I speak on behalf of my client [the plaintiff] who has conveyed his acceptance of this settlement offer to me, myself.*

. . . . . . . . . . . . . . .

THE COURT: I will ask each counsel to identify himself. Did you want to say anything further?

MR. SHANDELL: No, Your Honor. . . .

THE COURT: Anything more by the United States?

MR. McFARLAND (Assistant United States Attorney): No.

Transcript of Proceedings before Magistrate Judge Caden, dated Jan. 11, 1995 ["Transcript" or "Tr."], at 4–7 (emphasis added). The consent of Mr. Marks on behalf of defendant St. John's Episcopal Hospital was obtained shortly after the conclusion of the Settlement Conference.

A number of events subsequently transpired to render this settlement the subject of further litigation. The parties' dispute concerning the validity and construction of the settlement agreement was precipitated by a letter sent by Kevan Cleary, Esq., Assistant United States Attorney ["AUSA"], to Magistrate Judge Caden, dated January 17, 1995. Although he was counsel of record for the Government, having represented it in several prior settlement negotiations with respect to the instant actions, Mr. Cleary was not present at the open-Court stipulation before Magistrate Judge Caden because he was preparing for trial before another Judge of this Court. Unable to obtain an adjournment of the conference, another attorney from the United States Attorney's Office had appeared in Mr. Cleary's place and affirmed the Government's assent to the settlement. In this letter, Mr. Cleary took the position that the United States' offer of $750,000 was not final, but instead was subject to approval by the United States Department of Justice. Mr. Cleary concluded this letter by expressing his intent "to finalize this settlement." Letter from Kevan Cleary, Esq., Assistant

United States Attorney, to Magistrate Judge John L. Caden, dated Jan. 17, 1995.

In response to this letter, the plaintiff initially took the position that the stipulated settlement was enforceable. In a letter to Mr. Cleary dated January 25, 1995, plaintiff's counsel denounced the Government's contention that the settlement was conditional, noting that the Government's offer of $750,000 had been "on the table" since December 6, 1994, and that at no point prior to the placement of the settlement on the record had there been any suggestion that this offer was subject to approval by the Department of Justice. Thereafter, consistent with the existence of an enforceable agreement, plaintiff's counsel, on February 10, 1995, deposited into a client escrow account a check in the amount of $300,000 that had been remitted to him by Medical Liability Mutual Insurance Company, the insurer for defendant Peninsula. Plaintiff's counsel subsequently attempted to return these funds to Peninsula by issuance of a check, dated March 8, 1995, on plaintiff's counsel's attorney trust account for the same amount that was previously deposited. Peninsula, however, rejected this check on the grounds that the plaintiff already had provided releases and stipulations of discontinuance to said defendant.[1] *See* Feeny Reply Aff. Ex. A–C; Shandell Aff. in Opp. to Cross–Motion Ex. B.

In addition, on March 27, 1995, the plaintiff served a motion upon the defendants (which he subsequently withdrew) to enforce the settlement in accordance with the terms stipulated at the Settlement Conference on the ground that the United States had reneged on its obligations. In the event that the United States were found not to be bound by its offer of $750,000, the plaintiff, as an alternative basis for relief, sought to reinstate the subject cases to the trial calendar.

The plaintiff's position subsequently changed from being a proponent of the settlement to seeking its dissolution. This change in position was attributable in part to new information that the plaintiff received concerning the amount of the liens asserted

against him, and the Government's newly articulated position that its prior offer of $750,000 was conditional upon the payment of these liens. It is undisputed that at the time of the Settlement Conference, the plaintiff possessed actual knowledge of liens aggregating only $111,964.44, comprised of a lien from the New York City Department of Social Services (Medicaid) in the amount of $107,883.74 and a public assistance lien in the amount of $4,080.70. These amounts are reflected in a letter dated July 14, 1994, sent by the City of New York, Division of Liens and Recovery to Steven Smedresman, Esq., an attorney who was associated with plaintiff's counsel. *See Smedresman* Aff. Ex. B. This letter reports the following information concerning the then-existing claims of the Department of Social Services against the proceeds of any recovery from a personal-injury lawsuit:

> The Public Assistance claim is for the amount of $4,080.70 covering the period from 10/86 to 7/88. This amount may increase.
>
> *The Medicaid lien is for the amount of $107,883.74 covering the period from 6/1/88 to 5/10/94. This amount may increase.*
>
> The above claim(s) is/are made pursuant to the New York State Social Services Law Sections 104 and 104(b).
>
> You must contact our office prior to distribution of the lawsuit proceeds. We will provide you with the final amount of our claim and prepare a bill to properly credit this client's account.

*Id.* (emphasis added). In addition, attached to this letter was a Notice of Lien, dated July 11, 1994, which reported a lien in the aggregate sum of $107,883.74 for medical services rendered to the plaintiff through May 10, 1994. With respect to the potential for this amount to increase, the Notice of Lien provides:

> PLEASE TAKE FURTHER NOTICE that this lien shall not be deemed to be limited to the aforesaid amount. It shall also include medical care granted after the

---

1. A stipulation of discontinuance also was executed by the plaintiff in favor of defendant Ad-

dabbo Health Center. *See* Natale Aff. Ex. A.

date hereof, and upon receipt of notice of the final disposition of the recipient's right of action, an amended Notice of Lien will be served upon you, setting forth the total amount of medical care furnished to the said recipient since the date of the occurrence of said injuries. DISBURSEMENT SHOULD NOT BE MADE PRIOR TO RECEIPT OF AN AMENDED NOTICE OF LIEN, OR A WRITTEN STATEMENT FROM THE COMMISSIONER OF SOCIAL SERVICES TO THE EFFECT THAT THE AMOUNT SET FORTH HEREIN CONSTITUTES THE TOTAL LIEN.

*Id.* (emphasis in original). Plaintiff's counsel has conceded that he was aware that the amount of this lien was substantially less than the value of the medical and hospital services that had been provided to his client, and had warned his client that the aggregate amount of the liens could rise to as much as $300,000. *See* Transcript of Conference dated Apr. 7, 1995, at 34.

On March 23, 1995, Mr. Cleary sent plaintiff's counsel a letter which clashed with plaintiff's expectations concerning the aggregate amount of the liens, and sought to impose what plaintiff regarded as new conditions upon the settlement:

I have made some progress toward obtaining approval by the Department of Justice in Washington of the proposed settlement of this case.

It would greatly facilitate this matter if you would affirm that Mr. Ostman intends to pay to the New York State Deputy Attorney General for Medicaid Fraud Control the full amount of the Medicaid lien against your client as well as the Medicare lien. As you know, the settlement proposal under discussion never included a waiver of public liens for health care expenses disbursed.

If Department of Justice approval is obtained for the $750,000 settlement payment by the federal government to plaintiff, we would expect that payment be made as follows: The government will deduct the Medicaid lien from the $750,000 that would become due to plaintiff and will deliver a check directly to the New York State Dep-

uty Attorney General in the amount of the Medicaid lien. The government will also deduct from the payment the amount of the Medicare lien. Your client will receive the remainder.

I await your affirmation of your client's intention to pay off the liens. *Without such an affirmation, the federal government cannot agree to settle this case.*

Shandell Aff. Ex. G (emphasis added). With respect to the amount of the alleged "Medicare lien," Mr. Cleary asserted that the plaintiff had received Medicare benefits totalling $253,939.51 as of February 1995. *See* Gov't Resp. to Pl.'s Motion, at 3.

Thereafter, by letter dated March 28, 1995, Jon M. Bevilacqua, Esq., Special Assistant Attorney General to the New York State Special Prosecutor's Office for Medicaid Fraud Control, wrote to plaintiff's counsel advising him that between January 23, 1989 and February 15, 1995, New York State had incurred $302,370.67 in Medicaid expenditures on behalf of the plaintiff. This letter further provided that the aforementioned "amount does not duplicate the Medicaid lien of the New York City Department of Social Services in total." Letter from Jon M. Bevilacqua, Special Assistant Attorney General, to Richard E. Shandell, Esq., dated Mar. 28, 1995. In addition, this letter states that the aforementioned amount does not include "claims relating to care in 1988 at Bellevue Hospital totalling $64,822.18," and "[a]ny of the amounts on the New York City lien for 'all other outpatient care' prior to January 23, 1989...." *Id.*

On or about April 5, 1995, Mr. Cleary received authorization from the Department of Justice to settle this case in the amount of $750,000, subject to the plaintiff's payment of all outstanding liens, and notified the Court as follows:

Dear Judge Seybert:

I have just received word from the Department of Justice in Washington that it has now granted this office authority to settle this case as to the government for $750,000, provided all outstanding liens are paid by plaintiff.

Letter from Kevan Cleary, Esq., Assistant United States Attorney, to the Court, dated Apr. 5, 1995 (Shandell Aff. Ex. F). There is no evidence in the record to suggest that the plaintiff represented to the Government that he would pay off the liens indicated in Mr. Cleary's letter dated March 23, 1995, notwithstanding Mr. Cleary's admonition in that letter that absent an affirmation of plaintiff's intention to pay off the liens the federal government could not agree to settle this case. *Thus, despite the Government attorney's representation that an affirmation to pay off the asserted "Medicaid and Medicare liens" was required in order for the settlement to be authorized, said authorization was provided notwithstanding the plaintiff's failure to give such assurances.*

In view of the foregoing sequence of events, the Court held a conference on April 7, 1995, whereupon the parties were directed to file formal motions addressing their respective positions.

### EVIDENTIARY HEARING

After the parties had filed their respective motions and cross-motions, the Court conducted an evidentiary hearing on August 4, 1995 [the "Hearing"] for the purpose of clarifying the parties' intent concerning the meaning of the phrase, "subject to any outstanding liens," as employed in their stipulation before Magistrate Judge Caden. At this hearing, the Court took testimony from Richard E. Shandell, Esq., counsel to the plaintiff, and Kevan Cleary, Esq., the Assistant United States Attorney. Based upon the evidence presented, the Court makes the following factual findings:

1. At no point prior to or including the Settlement Conference [2] did plaintiff's counsel discuss with an Assistant United States Attorney whether any Medicare funds had been expended by the federal government on the plaintiff's behalf, or whether a lien would be asserted by the federal government with respect to any such funds expended. Hearing at 15. Rather, the parties' discussions with respect to liens were confined to ad-

dressing the amount and the quantitative accuracy of the Medicaid liens asserted by the City of New York Department of Social Services. *Id.* at 13–14, 17–18. In this regard, plaintiff's counsel told Mr. Cleary that a Medicaid lien had been asserted against his client in the amount of $107,000, and expressed surprise to Mr. Cleary that the asserted lien was of such small amount in view of the fact that the plaintiff had been a quadriplegic since 1988. *Id.* at 17–18. Mr. Cleary also communicated his surprise to plaintiff's counsel concerning the small amount of the lien. *Id.* at 17–18, 62. Aware of this potential for discrepancy, plaintiff's counsel had advised his client at the time of the putative settlement that the amount of Medicaid liens asserted could be as high as $300,000. *Id.* at 39.

2. At no point prior to or including the Settlement Conference had plaintiff's counsel heard of such a device as a "Medicare lien." *Id.* at 23–24. On one occasion in an unrelated case, however, plaintiff's counsel had encountered a situation in which the United States Attorney's Office intervened as a party in a pending litigation to enforce a Medicare claim. *Id.* at 24. In addition, plaintiff's counsel was aware of statutes that permitted the federal government to commence an action to recover Medicare funds from various parties, including the beneficiaries of Medicare-funded services. *Id.* at 27.

3. At no point prior to or including the Settlement Conference had plaintiff's counsel encountered a situation in which the State of New York asserted a Medicaid lien distinct from a Medicaid lien asserted by the City of New York Department of Social Services. Rather, at all relevant times, plaintiff's counsel believed that the City of New York Department of Social Services was the sole relevant agency responsible for the imposition of Medicaid liens. *Id.* at 28.

4. AUSA Cleary had requested from the Magistrate Judge—and was denied—an adjournment of the Settlement Conference at which the putative settlement was placed on

---

**2.** At the Hearing, the January 11, 1995 Settlement Conference was errantly referred to as hav-

ing transpired on January 16, 1995.

the record. *Id.* at 47. Mr. Cleary did not learn of the putative settlement until it was reported to him by Mr. McFarland, the Assistant United States Attorney who appeared in his place at the conference. *Id.*

5. Upon learning of the putative settlement, Mr. Cleary contacted the United States Department of Justice in Washington in an effort to obtain settlement authority for the amount of $750,000, which exceeded his authorization level. Mr. Cleary's efforts were hampered, however, in view of the pendency of proposed administrative regulations which would have increased Mr. Cleary's settlement authority to $1,000,000, thereby rendering superfluous his request for authorization. *Id.* at 47. As a result of the impending regulations, the Department of Justice took the position that it was unnecessary for it to act upon Mr. Cleary's request because the matter eventually would resolve itself. *Id.* at 47–48. Ultimately, the Department of Justice granted Mr. Cleary authority to settle the present action for $750,000 on the same day that Mr. Cleary received general authorization to settle cases for $1,000,000. *Id.* at 48.

6. Following the Settlement Conference, Mr. Cleary, in advocating to Washington that the Government should ratify the putative settlement, noted to the Department of Justice that Medicare probably had expended some monies on the plaintiff's behalf which the Government was entitled to recover. Mr. Cleary then made several phone calls to ascertain the amount of funds expended by Medicare on the plaintiff's behalf, which was determined to be $253,939.51 as of February 1995. *Id.* at 52–53; *see* Gov't Resp. to Pl.'s Motion, at 3. At no point prior to the Settlement Conference did Mr. Cleary (i) discuss with plaintiff's counsel whether the United States government, as an alleged tortfeasor, would assert a right of reimbursement under the Medicare statutes, or (ii) mention the phrase "Medicare lien" in the presence of plaintiff's counsel. Hearing at 53, 62, 64, 72. When he first learned of the putative settlement from Mr. McFarland, Mr. Cleary regarded the same to have achieved a settlement contingent upon ap-

proval by the Department of Justice. *Id.* at 65–66.

Subsequent to the evidentiary hearing, the plaintiff submitted a letter to the Court dated September 14, 1995, which had been sent to his associate, Steven Smedresman, Esq., by the City of New York, Division of Liens and Recovery. According to this letter, the City of New York had recently received an updated Medicaid claims report with respect to Mr. Ostman for the period between January 23, 1989 and July 17, 1995. Including additional liens that had been recently accounted for, the aggregate total of Medicaid liens outstanding as of July 17, 1995 came to $407,797.87. This letter further reported that, upon combining this amount with a previously asserted public assistance lien of $4,080.70, the aggregate amount of liens asserted by the City of New York totalled $411,878.57.

## DISCUSSION

### I. Contract Formation

 A settlement agreement is a contract that is subject to the ordinary rules of contract construction and interpretation. *See Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 661 (2d Cir.1994). Accordingly, it requires an offer, an acceptance, and consideration to be enforceable, and will be construed in accordance with the intent of the parties. *See Taylor v. Gordon Flesch Co.,* 793 F.2d 858, 862 (7th Cir.1986); *Degerman v. S.C. Johnson & Son, Inc.,* 875 F.Supp. 560, 562 (E.D.Wis.1995); *see also Bank of New York,* 35 F.3d at 661 (settlement agreement is generally construed in accordance with the intent of the parties). Interwoven in the analysis of the offer and the acceptance is the requirement of mutual assent, which considers whether there has been a meeting of the minds between the parties on all essential terms of the agreement. *See Schurr v. Austin Galleries,* 719 F.2d 571, 576 (2d Cir.1983); *Superview Network, Inc. v. SuperAmerica,* 827 F.Supp. 1392, 1396 (E.D.Wis.1993). In the instant case, the plaintiff claims that no such meeting of the minds occurred either (1) because the parties made a mutual mistake as to the amount of the obligations to which the settlement fund would be subject, or (2)

because the plaintiff was unilaterally mistaken with respect to such amount, and the Government knew or should have known of this mistake but failed to disclose it to the plaintiff. Alternatively, the plaintiff has stated that he will accept the settlement provided that the Court rules that the liens to which the $2,000,000 settlement fund is subject do not include the additional Medicare and Medicaid liens beyond those known to him at the time that the putative settlement was placed on the record. With respect to this alternative application for relief, the plaintiff requests a hearing to determine the portion of the settlement fund attributable to past medical expenses, and a declaration by this Court that, under the relevant statutory scheme, there is no such device as a "Medicare lien." In response to the plaintiff's application, the Government no longer contends that its contribution to the settlement fund should be earmarked, in part, to pay off the liens asserted by the State of New York, and now takes the position that its $750,000 contribution is subject to setoff solely with respect to the amount of federal funds expended by Medicare on the plaintiff's behalf.

■ In view of the Court's factual findings and the well-established principles of contract law, the Court's role is prescribed, in the first instance, to determine whether an enforceable agreement came into existence. *See White v. United States Dep't of Interior,* 639 F.Supp. 82, 87 & n. 3 (M.D.Pa.1986) (federal law applies to construction of settlement agreement with respect to the United States), *aff'd,* 815 F.2d 697 (3d Cir.1987). This analysis, in turn, entails an inquiry concerning (i) what the parties understood the terms of the defendants' offer to be, (ii) whether this offer was accepted by the plaintiff, and (iii) whether all material conditions implied in the parties' agreement have been satisfied to enable the remaining duties under the agreement to mature. This inquiry, concededly, is obfuscated to some extent by such issues as the authority of an Assistant United States Attorney to bind the United States government to a settlement, and moreover, a lawyer's duty of candor to the court. This latter principle looks unkindly upon attorneys who, knowingly or unwittingly, squander a court's limited resources by appearing at a settlement conference and making an offer of settlement without communicating to all interested parties, and to the court, that such offer exceeds their settlement authority. Nevertheless, in light of the present record—as an adjudication not of professional courtesy, but of law—the Court does not regard the failure of the government attorneys to disclose that they lacked settlement authority to provide a basis to vitiate the settlement. Rather, taking into consideration the parties' level of sophistication concomitant to their representation by counsel at all relevant times attending contract formation, and their constructive knowledge of the well-settled principle of agency law that generally requires the acts of an agent, including a government attorney, to be ratified by its principal in order for the principal to be bound, the Court regards the necessity of government ratification to constitute an implied condition precedent to the maturation of the remaining duties under the settlement agreement. *See Reed By and Through Reed v. United States,* 717 F.Supp. 1511, 1515 (S.D.Fla.1988), *aff'd,* 891 F.2d 878 (11th Cir.1990); *id.* at 1518 ("Our law has long recognized that the principles of contract law apply with equal force when the government is a party.") (citing *In re Smoot,* 82 U.S. (15 Wall.) 36, 21 L.Ed. 107 (1872)); *White,* 639 F.Supp. at 90 (noting general rule that parties who deal with a government agent are charged with notice of the limits of the agent's authority); *see also Turner v. United States,* 875 F.Supp. 1430, 1436 (D.Nev.1995) ("The United States cannot be bound to a settlement agreement where the agent of the United States who signed the agreement lacked the authority to enter into the agreement.").

■ "To discern [the parties'] intent a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances." *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985) (internal citations and quotations omitted); *see Reed,* 717 F.Supp. at 1515. Applying an objective test to determine the parties' intent with respect to the putative settlement at bar, the Court concludes that an enforceable contract subject to

the implied condition of government ratification was reached before Magistrate Judge Caden on January 11, 1995. Specifically, the Court finds that in exchange for the discontinuance of the subject lawsuits, the defendants offered an aggregate settlement fund in the amount of $2,000,000, "subject to any outstanding liens." This offer was accepted by the plaintiff at the Settlement Conference, thereby creating a contract.

Further, there was a meeting of the minds between the contracting parties concerning the meaning of the phrase "subject to any outstanding liens." In this regard, the Court observes that under the well-established principles of contract law, where the meaning of a word or phrase is *ambiguous*, i.e., subject to at least two conflicting reasonable interpretations, a court may look beyond the "four corners" of the agreement and "examine the record as a whole in an attempt to interpret the agreement so as to effectuate the intent of the parties." *Bank of New York*, 35 F.3d at 661 (citations omitted); *see In Time Prods., Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 665 (2d Cir.1994) (A district court may consider extrinsic evidence to resolve an ambiguity in a contract.); *Schurr v. Austin Galleries*, 719 F.2d 571, 574 (2d Cir.1983) (where the language of a consent judgment is ambiguous, consideration of surrounding circumstances is appropriate); *Monaghan v. SZS 33 Assocs.*, 875 F.Supp. 1037, 1043 (S.D.N.Y.1995) (citing *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994)), *aff'd*, 73 F.3d 1276 (2d Cir.1996); *Eardman v. Bethlehem Steel Corp.*, No. 84–CV–0274E(H), 1994 WL 721386, at *4 (W.D.N.Y. Dec. 29, 1994) (If a provision of a settlement agreement is ambiguous, a court can look beyond the "four corners" of the

agreement.). As a general rule of construction, "[w]here one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent." *Bank of New York*, 35 F.3d at 662 (citations omitted).

Upon consideration of the evidence in the record, the Court concludes that the parties intended the phrase "subject to any outstanding liens" to mean that at some closing procedure subsequently to be agreed upon, portions of the aggregate settlement fund would be disbursed to pay off any liens asserted by *non-federal* agencies as of the date that the settlement fund was distributed to the plaintiff. In this regard, the fact that the plaintiff may have underestimated the amount of the outstanding liens asserted by the non-federal agencies is not a defense to the enforcement of this agreement, because the language of the stipulation evinces the parties' intent that the plaintiff would bear the risk with respect to the amount of "*any* outstanding liens" asserted by such agencies. *See Beecher v. Able*, 441 F.Supp. 426, 429 (S.D.N.Y.1977), *aff'd*, 575 F.2d 1010 (2d Cir. 1978). In addition, the parties' course of dealings makes clear that they did not intend that the federal government's contribution of $750,000 to the settlement fund would be subject to setoff by any funds expended by Medicare.[3] Conversely, the parties' course of dealings confirms that they did not intend this settlement to preclude the federal government from bringing a subsequent lawsuit pursuant to 42 U.S.C. § 1395y(b)(2)(B)(ii),[4] or any other statute, to recover Medicare funds expended on behalf of the plaintiff.[5]

Finally, the Court regards the implied condition of government ratification of the settlement to have been satisfied. In

---

**3.** The Government's failure to raise the issue of Medicare reimbursement at the time of contracting is further reinforced through the absence of any counterclaims or cross-claims within its answer asserting a right to recover Medicare payments.

**4.** 42 U.S.C. § 1395y(b)(2)(B)(ii) provides in pertinent part:

In order to recover payment under this subchapter for ... an item or service, the United States may bring an action against any entity which is required or responsible under this subsection to pay with respect to such item or ser-

vice ..., or against any other entity ... that has received payment from that entity with respect to the item or service, and may join or intervene in any action related to the events that gave rise to the need for the item or service.

42 U.S.C.A. § 1395y(b)(2)(B)(ii) (West Supp. 1995).

**5.** In light of this construction of the parties' settlement agreement, it is unnecessary for the Court to address the parties' contentions as to whether there exists, as a matter of law, a device known as a "Medicare lien."

this regard, in the absence of a time-is-of-the-essence provision in the parties' agreement, and in view of the lack of any detrimental change in position by any of the other contracting parties as a result of the Government's delay in ratifying the settlement for a period of 84 days, the Court considers the Government's ratification of the settlement to have been accomplished within a reasonable time in substantial compliance with this condition.

## II. Plaintiff's Asserted Grounds for Rescission

Having concluded that the prerequisites to contract formation have been met, the Court now turns to consider the plaintiff's asserted defenses. Specifically, the plaintiff's arguments may be construed to assert that the settlement agreement is voidable by him, on account of his failure to estimate accurately the amount of the outstanding liens, under the doctrines of mutual mistake, unilateral mistake, or estoppel.

██ At the outset, the Court observes that the doctrine of mutual mistake is unavailable to the plaintiff because the record fails to establish that the parties were mutually mistaken with respect to a fact or assumption going "to the heart of the agreement." *Beecher*, 441 F.Supp. at 430 (citations omitted); *see, e.g., Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887) (contract for sale of a barren cow was voidable where the cow was later discovered to be fertile).

██ In addition, the plaintiff is unable to invoke the rubric of unilateral mistake under the facts of this case. "It is well settled that in order for a court to allow rescission of a contract on the basis of a unilateral mistake, a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made." *Ludwig v. NYNEX Serv. Co.*, 838 F.Supp. 769, 795 (S.D.N.Y.1993) (citing *United States v. Metro Novelty Mfg. Co.*, 125 F.Supp. 713, 713–14 (S.D.N.Y.1954)). Upon consideration of the record, the Court finds that the plaintiff fails to sustain this defense as he is unable to establish that at the time

of the Settlement Conference, any of the defendants, through their attorneys, knew or should have known that the plaintiff was proceeding under a mistaken assumption concerning the amount of the non-federal agency liens, and failed to disclose this to the plaintiff. Indeed, the Court has explicitly found that, prior to the January 11, 1995 settlement conference, AUSA Cleary told plaintiff's counsel that he believed the Medicaid lien figure previously provided by the City of New York Department of Social Services to be substantially understated. In addition, plaintiff's counsel warned his client to expect the assertion of additional liens that could increase the aggregate amount thereof to approximately $300,000. In light of these circumstances, and moreover, in view of the language of the Notice of Lien indicating that the lien asserted through May 10, 1994 was subject to augmentation, it is clear that the possibility that the state Medicaid liens subsequently asserted would exceed plaintiff's subjective expectations constituted a risk that the plaintiff freely undertook as part of his bargain. Therefore, the plaintiff's mistake may not be used as a basis for rescission. *See Beecher*, 441 F.Supp. at 429.

██ The plaintiff likewise is unable to invoke the doctrine of estoppel to prevent the enforcement of the settlement agreement against him. "Under the law of the Second Circuit, the elements of estoppel are (1) a representation of material fact, (2) reliance by the aggrieved party thereon, and (3) injuries resulting from such reliance. Each of these elements must be established to make out a claim of estoppel." *Ludwig*, 838 F.Supp. at 795 (citing *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993)). In this case, the plaintiff is unable to demonstrate that he relied to his detriment upon a representation made by one or more of the defendants concerning the amount of the state Medicaid liens. Accordingly, estoppel may not be used as a basis for rescission.

## III. Plaintiff's Request for a Hearing to Determine Portion of Settlement Fund Allocable to Past Medical and Hospital Expenses

██ Finally, the plaintiff has requested a hearing, pursuant to *Baker v. Sterling*, 39

N.Y.2d 397, 384 N.Y.S.2d 128, 348 N.E.2d 584 (1976), so that this Court may decide what portion of the $2,000,000 settlement fund is attributable to past medical and hospital expenses, and thereby susceptible to recovery by the City of New York Department of Social Services through its assertion of a Medicaid lien. This application is wrought with difficulties. Among other things, the Court observes that the appropriate State agency is not a party to this action, and possibly would assert the Eleventh Amendment as a defense to joinder. Further, any such ruling by this Court could be construed as an advisory opinion thereby warranting dismissal, because an indispensable party to such adjudication is absent from the proceeding. *See* Fed.R.Civ.P. 19(b). Conversely, a determination in the absence of such party presumably would lack the collateral estoppel effect that plaintiff desires, because the party against whom preclusion is sought would not have been afforded a full and fair opportunity to litigate this issue. *See Simmons v. Aiken,* 100 A.D.2d 769, 474 N.Y.S.2d 41, 42 (1st Dep't 1984) (City of New York Department of Social Services entitled to some discovery for *Baker v. Sterling* hearing, as it was not a party to the settlement); *see also Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995) (Under New York law, the doctrine of collateral estoppel "only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding.") (citations omitted). In view of these concerns, the plaintiff's request for a hearing is denied at this juncture without prejudice to reapply. In the event of reapplication, the parties will be required to brief these issues.

### CONCLUSION

For the foregoing reasons, the settlement is confirmed in accordance with the Court's analysis herein. In addition, plaintiff's motions and cross-motions to vacate the asserted Medicaid and Medicare liens at issue are denied. Further, the plaintiff's request for a hearing to determine the portion of the settlement fund that is attributable to past med-

ical and hospital expenses is denied without prejudice to reapply, within 20 days of the date that this Memorandum and Order is docketed, in accordance with the instructions stated herein. Finally, the parties' motions and cross-motions for sanctions are denied.

SO ORDERED.